IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAUI ELECTRIC COMPANY, LIMITED, a Hawaii corporation, | ) ) ) ) | CIVIL NO. 12-00486 SOM-BMK ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF |
| Plaintiff, | ) ) | PERSONAL JURISDICTION |
| vs. | ) ) ) | |
| CHROMALLOY GAS TURBINE, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

**I.      INTRODUCTION.**

This action concerns the destruction of a gas turbine owned and operated by Plaintiff Maui Electric Company, Limited ("MECO").  MECO alleges that one of the high pressure turbine blades manufactured by Defendant Chromalloy Gas Turbine, LLC, was faulty and caused more than $4 million in damages.  MECO asserts claims of negligence, strict liability, and negligent misrepresentation.  Chromalloy seeks dismissal of this action on the ground that this court lacks personal jurisdiction.  The court denies the motion.

**II.      BACKGROUND.**

Chromalloy is incorporated in Delaware and has its principal place of business in Florida.  See Declaration of Craig Haines ¶ 6, ECF No. 25-1.  In addition to providing repairs and

replacement parts for planes, Chromalloy "serves the industrial and marine gas turbine market." Id. ¶ 8. That is, it makes "after-market" parts for General Electric gas turbines, i.e., parts that can be installed after the turbines have already been purchased. Chromalloy indicated at the hearing that it sold turbine parts to companies like Jet Turbine Services, Inc., and TransCanada Turbine. At the time Chromalloy sold the parts, Chromalloy says that it did not know when and where these companies would resell and install them.

Beginning in 2003, MECO began retrofitting its General Electric turbines with Chromalloy parts and components, including Chromalloy's "nickel-based alloy single-crystal High Pressure Turbine blades." See Declaration of John Mauri ¶¶ 6-7, ECF No. 46-1. There is no dispute that this technology was used by multiple manufacturers or that Chromalloy only had a small percentage of the market for these parts. At the hearing on this motion, Chromalloy represented that it had up to 10% of the market for these parts.

MECO purchased the Chromalloy parts and components from Jet Turbine Services, Inc., which purchased them from Chromalloy. Id. ¶ 9. Jet Turbine Services then installed the Chromalloy parts and components in MECO's turbines. Id. For example, in May 2003, Chromalloy's high pressure turbine blades and vanes were installed in MECO's M-19 ESN-759 turbine. Similar blades

and vanes were installed in MECO's M-16 ESN-481-669 turbine in February 2004.  They were again installed on MECO's M—19 ESN-759 turbine in April 2007, when it was time to replace the Chromalloy parts from the 2003 installation.  Id.  Apparently, Chromalloy's high pressure turbine blades were also installed by Jet Turbine Services in another MECO turbine, ESN 481-677, in 2007.  See id. ¶ 22.  These are the parts that allegedly failed and caused damage in 2010.  See Complaint ¶ 19; Motion to Dismiss at 4, ECF No. 24-4.

     In January 2007, MECO sent its M-16 ESN 481-669 turbine to a Canadian company, TransCanada Turbine, for an overhaul. TransCanada discovered several cracks in the high pressure turbine blades of the ESN 481-669 turbine.  See Mauri Decl. ¶ 11. TransCanada shipped the blades to Chromalloy's office in Nevada for inspection and repair.  See Declaration of David Alan Lee, Jr., ¶ 14, ECF No. 25-3.  Chromalloy examined the blades and, in February 2007, issued a preliminary report concerning the cracks. See Ex. 1 to Lee Decl., ECF No. 26-1.  The preliminary report concluded that the cracks in the blades were caused by a "deposit of deleterious material onto the uncoated roots" of the blades. Id.  The preliminary report noted that the high pressure turbine blade roots do not have a protective coating applied to them because coatings "are very brittle and would crack if in contact with the disk under the engine load.  The crack would then

propagate into the component and result in premature failure." Id.  Lee says that, at a Western Turbine Users Conference in March 2007 in Arizona, Lee gave representatives from TransCanada and MECO a copy of the preliminary report.  See Lee Decl. ¶¶ 17-19.

Chromalloy then asked an independent metallurgical engineer, Dr. Ramesh Kar, to examine the blades that had been sent to Chromalloy by TransCanada.  See Lee Decl. ¶ 20.  On or about April 11, 2007, Kar issued his report.  See Ex. 2 to Lee Decl., ECF No. 27-1.  Kar concluded that the cracks in the turbine blades "were caused by exposure of the non-protected dovetail regions of the blades to an aggressive service environment extremely high in sulfur (such as due to a gas leak or inadvertent exposure to hot diesel fumes)."  Id.  Kar concluded that "the distress cracks were unrelated to any material/manufacturing defects in the blades or improper fabrication/installation."  Id.

In April 2007, Jet Turbine Services went to Maui to perform an overhaul of MECO's ECN 481-759 turbine.  See Lee Decl. ¶¶ 21-22.  According to MECO, Chromalloy was very interested in determining whether other blades in MECO's turbines had cracks in them.  Chromalloy employees, Lee and Gary Noah, traveled to Maui to observe the overhaul.  See Lee Decl. ¶ 22.  Lee says the blades of the ESN 481-759 turbine did not have the same cracks as

4

the ESN 481-669.  <u>Id.</u>  Lee also says that, while on Maui, he gave Jet Turbine Services and MECO a copy of Kar's report.  <u>Id.</u> ¶ 23. Mauri says that he talked with Lee during this visit.  <u>See</u> Mauri Decl. ¶ 13.

The Complaint alleges that, at some point in time, Chromalloy told MECO that the cracking of the ESN 481-669 high pressure turbine blades "was an isolated event requiring no further preventative measures for the remaining [high pressure turbine] packages on the other MECO GE turbine generators."  <u>See</u> Complaint, ¶ 30(d) and ¶ 16 ("Chromalloy investigated the incident and represented to MECO that the failure in the GE turbine 481-669 was an isolated event.").  MECO alleges that, based on those representations, it "took no further preventative measures with its other GE turbines retrofitted with the identical [high pressure turbine] packages."  Complaint ¶ 17.

In 2009, Chromalloy sent MECO a proposal to change out the high pressure turbine blades on the M-14 ESN 481-637 turbine. This proposal was accepted, and the work was completed in June 2009.  <u>See</u> Mauri Decl. ¶¶ 14-15.

In 2010, Chromalloy sent MECO a similar proposal to change out the high pressure turbine blades on the M-14 ESN 481-669 turbine.  This proposal was accepted, and the work was completed in 2010.  <u>See</u> Mauri Decl. ¶¶ 16-17.

MECO alleges that the uncoated and unprotected shank area of the ESN 481-677 turbine corroded and that, on September 3, 2010, one of the blades on the ESN 481-677 broke off and destroyed the turbine, causing over $4 million in damages.  See Complaint ¶¶ 18-20.

Larry Gasaway worked for Jet Turbine Services until he was hired by Chromalloy.  See Mauri Decl. ¶¶ 10, 18.  From 2008 to 2010, Gasaway "visited MECO's plant several times on behalf of Chromalloy to market Chromalloy products."  Id. ¶ 19.  Diederick Van Der Meyden, a Chromalloy sales representative, accompanied Gasaway on one of these trips.  Id. ¶ 20.

Mauri says that Van Der Meyden was transferred to Hawaii in 2007 "for the purposes of marketing Chromalloy products and services to Aloha Airlines."  Id. ¶ 21.  Mauri does not indicate how he has personal knowledge concerning the circumstances surrounding Van Der Meyden's move to Hawaii.  In his deposition, Van Der Meyden testified that he moved to Hawaii in 2008.  See Deposition of Diederick Oscar Van Der Meyden at 18, ECF No. 46-3.  He testified that, while in Hawaii, he worked for Chromalloy out of his home.  Id. at 20 and 70.  Van Der Meyden said he, not Chromalloy, asked that he be moved to Hawaii.  Id. at 23-34.  Van Der Meyden testified that, although he was a sales representative for Chromalloy, Hawaii was not part of his sales territory, which was Central and South America.  Id. at 22-24.

He testified that, when he was living in Hawaii, Chromalloy's sales representative for Hawaii was Gasaway.  Id. at 27 and 29. Van Der Meyden admitted that he unsuccessfully attempted to market Chromalloy's products to MECO, Tesoro, HECO (on the Big Island and in Hamakua), and Aloha Airlines.  Id. at 30-32.  He testified that, during the entire time he lived in Hawaii, he made no Chromalloy sales in Hawaii.  Id. at 71.

Gasaway says that, while he worked for Jet Turbine Services, he regularly conferred with Chromalloy regarding the gas turbines involving Chromalloy products at MECO.  See Declaration of Larry Gasaway ¶ 8, ECF No. 46-4.  He says that, when Jet Turbine Services first sold MECO the single-crystal turbine blade technology in 2003, he kept Chromalloy advised of the sale because MECO was one of the first power generation facilities using the technology.  Id. ¶ 6.  Gasaway says he worked for Jet Turbine Services from 2002 to 2007.  Id. ¶ 4. After that, he apparently went to work for Chromalloy.  See Van Der Meyden Test. at 27-29.

Craig Haines, Vice President Controller of Sequa Corporation (Chromalloy's parent company), says that Chromalloy does not own, rent, or lease property in Hawaii, does not have any personal property in Hawaii, does not have any bank accounts in Hawaii, pays no taxes to Hawaii, does not have a registered agent in Hawaii, is not registered to do business in Hawaii, and

does not specifically advertise in Hawaii.  <u>See</u> Declaration of
Craig Haines ¶¶  8-14, and 16-17, ECF No. 25-1.  He says that,
between 2007 and 2012, Chromalloy only had three years in which
it made any sales in Hawaii (2007-$47,966; 2009-$177,635; and
2010-$2,975).  <u>Id.</u> ¶ 15.  However, Haines says that Chromalloy's
wholly owned subsidiary, Pacific Gas Turbine, LLC, a Delaware
corporation with its principal place of business in San Diego,
had sales in Hawaii of $534,461 in 2007, $838,669 in 2009, and
$840,862 in 2010.  <u>Id.</u> ¶ 19.

III.      **LEGAL STANDARD.**

          A plaintiff has the burden of establishing personal
jurisdiction over a nonresident defendant.  <u>See Love v.</u>
<u>Associated Newspapers, Ltd.</u>, 611 F.3d 601, 608 (9th Cir. 2010);
<u>Schwarzenegger v. Fred Martin Motor Co.</u>, 374 F.3d 797, 800 (9th
Cir. 2004).  A plaintiff must establish personal jurisdiction
over a defendant with respect to each claim.  <u>Action Embroidery</u>
<u>Corp. v. Atl. Embroidery, Inc.</u>, 368 F.3d 1174, 1180 (9th Cir.
2004) ("Personal jurisdiction must exist for each claim asserted
against a defendant." (citing <u>Data Disc, Inc. v. Sys. Tech.</u>
<u>Assocs., Inc.</u>, 557 F.2d 1280, 1289 n.8 (9th Cir. 1977)).

          When, as here, a district court acts on a motion to
dismiss without holding an evidentiary hearing, a plaintiff need
only make a prima facie showing of jurisdictional facts to
withstand the motion to dismiss.  <u>Love</u>, 611 F.3d at 608;

8

Schwarzenegger, 374 F.3d at 800.  Although a plaintiff may not

simply rest on the bare allegations of the complaint,

uncontroverted allegations in the complaint must be taken as

true, and conflicts between parties over statements contained in

affidavits or declarations must be resolved in the plaintiff's

favor.  See Love, 611 F.3d at 608; Schwarzenegger, 374 F.3d at

800.

**IV.      ANALYSIS.**

The district court considers two factors before

exercising personal jurisdiction over a nonresident defendant in

a diversity of citizenship case: "1) whether an applicable state

rule or statute potentially confers jurisdiction over the

defendant; and (2) whether assertion of such jurisdiction accords

with constitutional principles of due process."  Flynt Distrib.

Co. v. Harvey, 734 F.2d 1389, 1392 (9th Cir. 1984).  "The

jurisdictional inquiries under state law and federal due process

merge into one analysis" when, as here, the state's long-arm

statute is "co-extensive with federal due process requirements."

Roth v. Garcia Marquez, 942 F.2d 617, 620 (9th Cir. 1991).  See

Cowan v. First Ins. Co. Of Hawaii, 61 Haw. 644, 649, 608 P.2d

394, 399 (1980) (Hawaii's long-arm statute, Haw. Rev. Stat.

§ 634-35, was adopted to expand the jurisdiction of Hawaii's

courts to the extent permitted by the due process clause of the

Fourteenth Amendment).  Accordingly, personal jurisdiction over Chromalloy depends on federal due process requirements.

The Due Process Clause protects a person's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)).  The Due Process Clause requires that defendants have "certain minimum contacts with [Hawaii] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316; Data Disc, Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977).  The minimum contacts required mean that the defendant must have purposefully availed itself of the privilege of conducting activities within the foreign jurisdiction, thereby invoking the benefits and protections of the foreign jurisdiction's laws. See Asahi Metal Indus. Co. v. Sup. Court of Cal., 480 U.S. 102, 109 (1987).  In applying Due Process Clause requirements, courts have created two jurisdictional concepts-- general and specific jurisdiction.

A court may exercise general jurisdiction over the defendant when the defendant is a resident or domiciliary of the forum state, or the defendant's contacts with the forum state are continuous, systematic, and substantial. Helicopteros Nacionales

de Columbia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984); Data Disc, 557 F.2d at 1287 ("If the nonresident defendant's activities within a state are 'substantial' or 'continuous and systematic,' there is a sufficient relationship between the defendant and the state to support jurisdiction even if the cause of action is unrelated to the defendant's forum activities."). MECO is not at this time asserting general jurisdiction in this case.[1]  This court therefore does not perform an examination of the extent of all of Chromalloy's sales or other activities in Hawaii.

Specific jurisdiction, on the other hand, may be found when the cause of action arises out of the defendant's contact or activities in the forum state.  See Roth v. Garcia Marquez, 942 F.2d 617, 620 (9th Cir. 1991); Data Disc, 557 F.2d at 1287.  To ensure that the exercise of specific jurisdiction is consistent with due process in this particular case, this court must be satisfied that the following have been shown:

> 1) the nonresident defendant must have purposefully availed himself of the privilege

---

[1]A court may exercise general jurisdiction when "the defendant has continuous and systematic contacts . . . with the forum state, even if those contacts are not related to the cause of action." Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)).  The defendant's contacts must be "so 'continuous and systematic' as to render them essentially at home in the form State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011) (citing Int'l Shoe, 326 U.S. at 317).

of conducting activities in the forum by some
affirmative act or conduct; 2) plaintiff's
claim must arise out of or result from the
defendant's forum-related activities; and
3) exercise of jurisdiction must be
reasonable.

Roth, 942 F.2d at 620-21.

The Supreme Court has held that personal jurisdiction
over an out-of-state company may be appropriate when that company
"delivers its products into the stream of commerce with the
expectation that they will be purchased by consumers in the forum
State." World-Wide Volkswagen, 444 U.S. at 297-98. "[I]f the
sale of a product of a manufacturer or distributor . . . is not
simply an isolated occurrence, but arises from the efforts of the
manufacturer or distributor to serve directly or indirectly, the
market for its product in other States, it is not unreasonable to
subject it to suit in one of those States." Id. at 297.

A majority of the Supreme Court has yet to agree on the
exact requirements for the application of the stream of commerce
theory. In J. McIntyre Machinery, Ltd. v. Nicastro, 131 S. Ct.
2780, 2788 (2011), and Asahi Metal Industry Co. v. Superior
Court, 480 U.S. 102, 112 (1987), a plurality stated that a
company must do more than just place a product in the stream of
commerce; it must purposefully direct some action toward the
forum state. Action showing "purposeful direction" might include
"designing the product for the market in the forum State,
advertising in the forum State, establishing channels for

12

providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Asahi Metals, 480 U.S. at 112.  The concurrence in Asahi Metals, id. at 117 (Brennan, White, Marshall, & Blackmun, JJ., concurring), viewed as sufficient the placement of a product in the stream of commerce, so long as the company in issue was aware that the product was being marketed in the forum state.  This court examines here whether Chromalloy purposefully directed some action toward Hawaii.

In tort cases, the Ninth Circuit, sitting en banc, has stated that a defendant purposely avails itself of a forum in the following circumstances: "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (formatting omitted).[2]  The Ninth Circuit has explained that the third prong is satisfied when a defendant's intentional act has "foreseeable effects" in the forum.  Brayton Purcell LLP

---

[2]The Ninth Circuit en banc panel, noting that prior panels had been unclear as to whether the "brunt" of the harm had to be suffered in the forum state, clarified that the "brunt" of the harm did not have to be suffered in the forum state.  Id. at 1207.

<u>v. Recordon & Recordon</u>, 606 F.3d 1124, 1131 (9th Cir. 2010).
Chromalloy's alleged acts satisfy this test.

Chromalloy knew from at least 2003 that its parts were being installed in MECO's gas turbines. Gasaway, who worked for Jet Turbine Services at that time, informed Chromalloy that MECO was using Chromalloy's high pressure turbine blades in MECO's turbines when Jet Turbine Services first sold MECO the parts in 2003. <u>See</u> Gasaway Decl. ¶ 6, ECF No. 26-4. According to Gasaway, during the time he worked for Jet Turbine Services, he regularly conferred with Chromalloy regarding MECO's gas turbines using Chromalloy products. <u>Id.</u> ¶ 8. From 2008 to 2010, Gasaway continued to market high pressure turbine blades to MECO while working for Chromalloy. <u>See</u> Mauri Decl. ¶ 19. The Chromalloy parts that allegedly malfunctioned and destroyed the turbine were apparently sold by Jet Turbine Services to MECO in 2007. <u>See</u> Mauri Decl. ¶ 22. In January of that year, MECO had sent one of its turbines to TransCanada Turbine for an overhaul. <u>See</u> <u>id.</u> ¶ 11. TransCanada discovered several cracks in the high pressure turbine blades manufactured by Chromalloy. <u>Id.</u> TransCanada shipped the blades to Chromalloy for inspection and repair. <u>See</u> Lee Decl. ¶ 14.

Chromalloy's preliminary report indicated that the cracks in the blades were caused by a deposit of material on the uncoated roots of the blades. Lee says that he gave a copy of

this report to MECO in March 2007. Id. ¶¶ 17-19. Chromalloy
then hired an independent metallurgical examiner to look at the
blades. That expert, Dr. Kar, concluded that the cracks had been
caused by exposure of the unprotected parts of the blades to an
environment high in sulfur. Id., Ex. 2. Lee says that, in April
2007, he and Noah, also of Chromalloy, went to MECO to observe an
overhaul being done by Jet Turbine Services. Lee says that he
provided Dr. Kar's report to MECO at that time. Id. ¶ 23. Lee
says that he did not notice any cracks in the overhauled turbine.
Id. ¶ 22.

　　　　MECO alleges that Chromalloy led it to believe that the
cracking of the turbine blades in 2007 was an isolated event and
that no further measures were needed to prevent cracking of
turbine blades in other turbines. See Complaint ¶ 30(d) and
¶ 16. MECO alleges that, as a result, it took no further
preventive measures. Id. ¶ 17.

　　　　Chromalloy purposefully availed itself of the privilege
of conducting business in Hawaii with respect to the negligence
and strict liability claims asserted in the Complaint.
Chromalloy did more than merely place its parts in the stream of
commerce. It knew that some of its parts were being installed on
MECO's turbines. It also knew that one of MECO's turbines using
Chromalloy blades had developed cracks in the blades. It
allegedly indicated to MECO that the cracking of the blades was

an isolated incident, leading MECO to believe that Chromalloy's parts could be safely used in the manner intended.  Chromalloy then continued to market its parts to MECO until the blades failed again.  Under these circumstances, Chromalloy can be said to have purposefully availed itself of the privilege of conducting business in Hawaii with respect to the negligence and strict liability claims.

Chromalloy also purposefully availed itself of the privilege of conducting business in Hawaii with respect to the negligent misrepresentation claim.  The alleged misrepresentation(s), even if made outside of Hawaii, had an allegedly sufficient effect in Hawaii to support purposeful availment.  See Haisten v. Grass Valley Med. Reimbursement Fund, 784 F.2d 1392, 1397 (9th Cir. 1986)).  That is, Chromalloy knew that its products were being installed in MECO's turbines.  It knew that one of the turbines had developed cracks.  It then intentionally passed on two reports that tended to indicate that the cracking of the blades in one of the turbines was the result of environmental factors requiring no remedial measures to prevent similar cracking of blades in other turbines.  It was foreseeable that, given Chromalloy's alleged representations, MECO would take no further remedial measures.  The effect of Chromalloy's alleged representations in Hawaii was foreseeable.  Under these circumstances, Chromalloy can be said to have

16

purposefully availed itself of the privilege of conducting business in Hawaii for purposes of the negligent misrepresentation claim.

Because Chromalloy's alleged acts relating to its alleged negligence, strict liability, and misrepresentation supposedly caused MECO's turbine to be destroyed, MECO also satisfies the second prong of the personal jurisdiction test-- that the claim arise out of or be related to the defendant's forum related activities.  This leaves the final prong for adjudication--whether the exercise of personal jurisdiction is reasonable.  The Ninth Circuit has noted that, once purposeful availment has been established, the forum's exercise of jurisdiction is "presumptively reasonable" and that, to rebut that presumption, a defendant must present a "compelling case that the exercise of jurisdiction would, in fact, be unreasonable."  Roth, 942 F.2d at 625.

In determining reasonableness, the court considers: (1) the extent of purposeful interjection into the forum state; (2) the burden on the defendant; (3) the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in the suit; (5) the most efficient judicial resolution of the dispute; (6) the convenience and effectiveness of relief for the plaintiff; and (7) the existence of an alternative forum. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985);

Ziegler, 64 F.3d at 475.  None of these seven factors is dispositive.  Instead, all seven factors must be balanced. Ziegler, 64 F.3d at 475.

### A.  Purposeful Injection.

"Even if there is sufficient 'interjection' into the state to satisfy the purposeful availment prong, the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the reasonableness prong." Panavision, 141 F.3d at 1323 (quoting Core-Vent, 11 F.3d at 1488).  The court must therefore determine the degree of Chromalloy's intrusion into Hawaii.  Beginning in 2007 or 2008, Chromalloy had a sales representative that was marketing its products to MECO.  This intrusion into Hawaii suffices for this court to find that this factor weighs in MECO's favor.

### B.  Defendant's Burden in Litigating.

The primary concern is the defendant's burden.  FDIC v. British-Am. Ins. Co., 828 F.2d 1439, 1444 (9th Cir. 1987).  The Supreme Court has recognized the "unique burdens placed upon one who must defend oneself in a foreign legal system." Asahi Metal, 480 U.S. at 114.  These unique burdens "should have significant weight in assessing the reasonabless of stretching the long arm of personal jurisdiction over national borders." Id.  Here, the burden on Chromalloy in defending this action in this court is great, as it will have to defend itself thousands of miles from

18

where it does most of its business.  However, "unless the 'inconvenience [of the defendant litigating in the forum state] is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.'" See Panavision, 141 F.3d at 1333.  While the burden on Chromalloy and its witnesses is significant, the inconvenience of litigating in Hawaii does not amount to a deprivation of due process.  In this "era of fax machines and discount air travel, requiring [Chromalloy] to litigate in [Hawaii] is not constitutionally unreasonable."  See Panavision, 141 F.3d at 1323.  At best, this factor weighs only slightly in favor of finding litigation in Hawaii unreasonable.

### C.    Conflict With Sovereignty of Defendant's State.

The court also considers the extent to which its exercise of jurisdiction in Hawaii would conflict with the sovereignty of Delaware or Florida.  There has been no demonstration of any conflict with the sovereignty of either of these jurisdictions.  Accordingly, this factor is neutral.

### D.    Forum State's Interest.

Hawaii has a "strong interest in providing an effective means of redress for its residents who are tortiously injured." Miracle, 87 F. Supp. 2d 1060, 1070 (D. Haw. 2000).  This factor weighs in favor of exercising jurisdiction.

19

### E.   Efficient Resolution.

Efficient judicial resolution of the controversy focuses on the location of the evidence and witnesses. Panavision, 141 F.3d at 1323-24.  This factor, however, "is no longer weighed heavily given the modern advances in communication and transportation."  Id.   Given the probability that witnesses and evidence are located both on the mainland United States and in Hawaii, this factor is neutral.

### F.   Convenient and Effective Relief for Plaintiff.

While Hawaii is certainly a more convenient forum for MECO than somewhere on the mainland United States, there is no reason to believe that MECO could not obtain effective relief in other courts.  Under these circumstances, this factor weighs only slightly in favor of MECO.

### G.   Alternative Forum.

The plaintiff bears the burden of proving the unavailability of an alternative forum.  See Core-Vent, 11 F.3d at 1490.  MECO has not demonstrated the unavailability of an alternative forum.  This factor weighs slightly in favor of Chromalloy.

### H.   Balancing of the Factors.

On balance, the exercise of personal jurisdiction over Chromalloy is reasonable.  The first, fourth, and sixth factors

weigh in favor of exercising jurisdiction, although the sixth factor only slightly so.  On the other hand the second and seventh factors weigh slightly in favor of not exercising jurisdiction over Chromalloy.  The third and fifth factors are neutral.

**V.      CONCLUSION.**

Because the court has personal jurisdiction over Chromalloy with respect to each claim asserted in the Complaint, the motion to dismiss for lack of personal jurisdiction is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 23, 2013.



 /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Maui Elec. Co. v. Chromalloy Gas Turbine, LLC; Civil No. 12-00486 SOM/BMK; ORDER
DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION