# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

MAUI ELECTRIC COMPANY,
LIMITED, a Hawaii corporation,

      Plaintiff,

    vs.

CHROMALLOY GAS TURBINE, LLC,
a Delaware limited liability company,

      Defendant.

—————————————————————

CHROMALLOY GAS TURBINE, LLC,
a Delaware limited liability company,

      Third-Party Plaintiff,

    vs.

JET TURBINE SERVICE, LLC, et al.,

      Third-Party Defendants.

CIVIL NO. 12-00486-SOM-BMK

MEMORANDUM IN SUPPORT OF
MOTION

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES .......................................................... iii

I.   FACTUAL BACKGROUND ..................................................... 3

   A. The Parties ......................................................................... 3

   B. Chromalloy Develops Its Hpt Components ........................ 6

   C. Plaintiff Becomes A Launch Customer ............................... 9

   D. Corrosion Is Discovered On Esn 481-669 In January 2007 ......... 12

   E. The September 3, 2010 Incident ....................................... 14

   F. Plaintiff's Operations, Environment, And Maintenance Practices ............ 18

   G. Plaintiff's Failure To Preserve/Produce Evidence .............. 22

   H. Plaintiff's Economic Damages ......................................... 24

II.  ARGUMENT ....................................................................... 24

   A. Summary Judgment Standard ........................................... 24

   B. Chromalloy Is Entitled To Summary Judgment On The Plaintiff's Negligence, Strict Liability, And Negligent Misrepresentation Claims Because They Are Barred By The Economic Loss Rule ............................. 25

      1. PLAINTIFF'S NEGLIGENCE AND STRICT LIABILITY COUNTS ARE BARRED BY THE ECONOMIC LOSS RULE BECAUSE THEY SEEK RECOVERY FOR PURELY ECONOMIC LOSSES ASSOCIATED WITH DAMAGE TO AN INTEGRATED PRODUCT ........................... 26

      2. THE ECONOMIC LOSS RULE ALSO BARS PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM BECAUSE IT TOO SEEKS RECOVERY FOR PURELY ECONOMIC LOSSES AND IS

sa5949c.docx

PREMISED ON DUTIES ARISING OUT OF THE TRANSACTION AT
ISSUE................................................................................................... 29

C. Summary Judgment Should Be Granted To Chromalloy On Plaintiff's
Negligence And Strict Liability Counts Because Plaintiff Has Failed To Adduce
Evidence That Chromalloy's Product Was Defective Or That It Caused
Plaintiff's Losses. .............................................................................. 33

    1. PLAINTIFF'S EXPERTS HAVE NO BASIS FOR OPINING AS TO
    DEFECT OR CAUSATION. ....................................................... 33

    2. PLAINTIFF HAS NO OTHER EVIDENCE ESTABLISHING
    CAUSATION, THAT CHROMALLOY WAS NEGLIGENT, OR THAT ITS
    PRODUCT IS DEFECTIVE. ...................................................... 36

III.  CONCLUSION ............................................................................. 38

sa5949c.docx

# TABLE OF AUTHORITIES

<u>Cases</u>

*Hawaii Motorsports Inv., Inc. v. Clayton Grp. Servs.*,

    CIV. 09-304 SOM/BMK, 2009 WL 3109941 (D. Haw. Sept. 25, 2009)..... 30, 32

*Windward Aviation, Inc. v. Rolls-Royce Corp.*,

    CIV. 10-00542 ACK, 2011 WL 2670180 (D. Haw. July 6, 2011)..................... 29

*Baker v. Castle & Cooke Homes Hawaii, Inc.*,

    CIV. 11-00616 SOM, 2012 WL 1454967 (D. Haw. Apr. 25, 2012) (Mollway, J.)

    .......................................................................................................... 25, 27, 35

*Bd. of Directors v. Venture 15, Inc.*,

    167 P.3d 225 (2007) ........................................................................................ 26

*Cardwell v. Netherland*,

    971 F. Supp. 997 (E.D. Va. 1997)................................................................... 32

*City Exp., Inc. v. Express Partners*,

    87 Haw. 466, 959 P.2d 836 (1998) ................................................................ 34

*Exxon Shipping Co. v. Pac. Res., Inc.*,

    835 F. Supp. 1195 (D. Haw. 1993) ........................................................... 27, 28

*Keahole Point Fish LLC v. Skretting Canada Inc.*,

    971 F. Supp. 2d 1017 (D. Haw. 2013) ................................................. 25, 28, 32

*McNally v. Univ. of Hawaii*,

    780 F. Supp. 2d 1037 (D. Haw. 2011) ..................................................... 24, 25, 39

*Ritchie v. United States*,

    451 F.3d 1019 (9th Cir. 2006) ................................................................................ 38

*Tabieros v. Clark Equip. Co.*,

    85 Haw. 336, 944 P.2d 1279 (1997) ..................................................................... 35

<u>Rules</u>

Fed. R. Civ. P. 26 ............................................................................................................. 17

Fed. R. Civ. P. 56(c) ....................................................................................................... 24

Fed. R. Evid. 702 .............................................................................................................. 36

Fed. R. Evid. 801(c) ......................................................................................................... 37

## MEMORANDUM IN SUPPORT OF MOTION

Plaintiff brought this product liability action against Chromalloy to recover financial losses incurred when equipment owned by Plaintiff, a model LM 2500 gas turbine engine, failed.  There is no dispute that the warranty applicable to this transaction was for 18 months and 12,000 engine operating hours.  Chromalloy sold the turbine blades, which were claimed to have caused the failure, to Third-party Defendant Jet Turbine Services, Inc. (JTS) more than five years before the turbine failure occurred, and JTS installed those blades in one of Plaintiff's LM 2500 turbines nearly four years before it failed.  Plaintiff filed its complaint with claims sounding in negligence and strict liability only after it had learned that the warranty period for the turbine components at issue had lapsed.

Between May 2003 and April 2010, Plaintiff purchased 10 sets of these blades and associated turbine vanes from JTS and other depots.  On September 3, 2010, one of Plaintiff's engines experienced a sudden failure during engine operation.  There is no dispute in this case that the engine failure resulted in no other property damage aside from damage to the engine and no personal injury.  Summary judgment is warranted here because Plaintiff's losses are purely economic, and its claims are barred in their entirety by the economic loss rule.  That rule serves to ensure that purely financial losses are governed by the law of

1

contract or warranty, not the law of tort, which is reserved for injuries to the person, or damage to property, other than damage to a product itself.

Plaintiff's claims are not compensable in tort. Even if Plaintiff were able to proceed with a tort action against Chromalloy, though, Plaintiff's negligence and strict liability claims also fail because Plaintiff has no evidence that Chromalloy's turbine blades were defective or negligently manufactured, or that Chromalloy otherwise caused the failure of Plaintiff's gas turbine. The evidence, rather, suggests that cause of this incident stems from Plaintiff's operating history and maintenance practices.

Since 1995, Plaintiff was aware that its air filters were at times ineffective due to poor maintenance. As a result, its engines ingested unfiltered air containing sulfur, sodium, ash, and other contaminants known to promote corrosion and reduce engine life. Evidence shows that Plaintiff's filter maintenance practices did not improve over time. Although Plaintiff claims it was performing preventive maintenance on its engines, there is almost no documentation to prove it. In fact, the condition of Plaintiff's engines suggests otherwise. Perhaps most troubling, Plaintiff's operational history reveals a chronic disregard for system alarms which serve to alert plant personnel of engines in distress or in need of attention. This culture of ignoring alarms has led to major engine damage on occasion, and likely

2

contributed to the damage to ESN 481-677, the engine that failed on September 3, 2010.

For these reasons, summary judgment is warranted.

## I. FACTUAL BACKGROUND

### A. The Parties

Chromalloy Gas Turbine LLC provides high technology component repairs and component manufacturing for owners and operators of gas turbines. Declaration of Stephen Wood ("WDec"), ¶4. Chromalloy has been in business for more than 60 years, and it is now a leading supplier of gas turbine components. WDec, ¶5. Much of Chromalloy's work involves repairs to engine components for the aerospace industry. WDec, ¶6. Aside from engine repairs, Chromalloy is authorized by the FAA to manufacture new components for installation into aircraft engines. WDec, ¶7.

Beginning in the 1980's, Chromalloy began to apply its experience manufacturing and repairing aircraft engine components to gas turbine engines used in other industries, such as the energy generation industry. WDec, ¶8. In about 1986, Chromalloy obtained a license from General Electric, the original equipment manufacturer of the LM series of gas turbines, to repair various LM

sa5949c.docx

turbine engine components.[1]   WDec, ¶9.   Between 1986 and 2002, Chromalloy

processed and/or repaired[2] in excess of 75,000 high pressure turbine blades and

vanes from LM series engines.  WDec. ¶12.

In approximately 2000, Chromalloy embarked on the process of designing

and manufacturing HPT blades and vanes for use in the LM 2500 model engine,

using the experience it had gained designing and manufacturing components for

aircraft engines.   WDec, ¶14.   The process took several years, and involved

extensive testing, including metallurgical testing, vibration testing, stress testing,

fatigue testing, and more.   WDec, ¶15.   Chromalloy, known for innovative

technological solutions, elected to use an alloy, called CM186LC, which was

shown to be superior to the alloy used by GE, a proprietary material known as

Rene 80.  WDec, ¶16.  CM186LC was a "single crystal" alloy, a term used to

describe the directional alignment of the microstructures of the metal.  WDec, ¶17.

Single crystal alloys had superior strength, thermal fatigue, and oxidation resistant

qualities compared to the Rene 80 alloy used by GE to manufacture HPT

components for the LM 2500.  WDec, ¶18.

---

[1] The LM series of engines fall within a class known as aero-derivative
industrial gas turbines.  WDec, ¶10.  This term indicates that these engines are land
or marine-based variants of engines originally designed for use with aircraft.
WDec. ¶11.
[2] Many compressor and turbine section components on a gas turbine are
designed to be reused, some multiple times with varying degrees of repair.  WDec.
¶13.

4

Plaintiff Maui Electric Company is a wholly owned subsidiary of the Hawaiian Electric Company.  WDec, ¶19.  Plaintiff maintains power generation operations on Maui at its Māʻalaea location.  WDec, ¶20.  At this location, Plaintiff maintains five LM2500 gas turbines in addition to other power generation equipment.  WDec, ¶21.  Two of these turbines are operated in a "base load" position (M-14 and M-16), meaning they run continuously.  WDec, ¶22.  Two others are operated part-time, in "peaking" positions (M-17 and M-19).  WDec, ¶23.  These turbine engines are brought on line during periods of peak demand.  *Id.*  Plaintiff's fifth LM 2500 turbine engine is a spare.  WDec, ¶24.  Plaintiff used this engine to replace one of the other engines when that engine was out for maintenance.  WDec, ¶25.  Plaintiff runs its turbines on liquid diesel fuel, as opposed to natural gas, which is also commonly used in the industry.  WDec, ¶26.

During operation, Plaintiff's engines are housed in an enclosure referred to in the industry as a "package."  WDec, ¶27.  When Plaintiff services or performs maintenance on its gas turbines or replaces parts, it has to shut the engines down and, depending on the degree of maintenance required, remove them from the package.  WDec, ¶28.  Typically, the LM 2500 undergoes major overhaul by a repair depot (disassembly, inspection, repair, replacement where needed, and servicing) every 50,000 operating hours.  WDec, ¶29.  The process can take several months to complete.  WDec, ¶30.

sa5949c.docx

Third-Party Defendant Jet Turbine Services, Inc. (JTS) operated an overhaul depot facility from 1995 up through approximately 2010, at which time it was sold to Third-Party Defendant Wood Group Pratt Whitney.  WDec, ¶31.  JTS performed overhauls of LM 2500 engines as well as other shop maintenance services.  WDec, ¶32.  In addition, JTS provided field support maintenance services, and its field representatives made numerous trips to Plaintiff's Māʻalaea facility to provide technical assistance between 2002 and 2008.  WDec, ¶33.  In this time period, JTS purchased numerous sets of Chromalloy manufactured LM 2500 HPT components that it used to build HPT modules for installation into the LM 2500 engines of JTS's customers, of which Plaintiff was one.  WDec, ¶34.

Depots like JTS routinely sell HPT modules (usually called "hot sections") through an exchange procedure.  WDec, ¶35.  The depot takes possession of the removed hot section, and provides to the customer an assembled hot section that meets the customer's specifications.  WDec, ¶36.  The depot overhauls the high time hot section for sale to another turbine user.  WDec, ¶37.  In the industry, this is described as a "rotable" hot section.  WDec, ¶38.

## B.   Chromalloy Develops Its Hpt Components

The high pressure turbine section of an engine is the section that is immediately downstream of the combustion section (where fuel and compressed air combine with a heat source to create combustion), and is therefore the section

sa5949c.docx

of the engine subject to the greatest stress in terms of loading and heat.  WDec,

¶39.  These components, under normal operating conditions, require replacement

more frequently than other engine components.  WDec, ¶40.

Below is a diagram of a LM2500:



After more than two years of product development design, engineering, and

testing, Chromalloy succeeded in fashioning components for the first and second

stages of the high pressure turbine section of the LM 2500 engine.  WDec, ¶41.

These blades and vanes were geometrically equivalent to the GE manufactured

components.  WDec, ¶42.  Had they not been the same geometrically, they would

not function in an engine whose other components were manufactured by GE.

WDec, ¶43.   Below are photographs of Chromalloy's stage 1 turbine blades

inserted into a disc manufactured by GE, , as well as fore and aft views of GE

manufactured dampers that serve to dampen blade vibrations, and seal the lower

cavity from hot combustion gases.  Declaration of John Ludwick ("Ludwick Dec"),

¶4, Exhibit A.; WDec, ¶44.



Below on the left is a photograph a damper being inserted into position

between two blades.  Ludwick Dec., Ex. A.  On the right is a damper assembly.  *Id.*



Chromalloy introduced its product at a meeting of the Western Turbine

Users group (an industry trade association) in March 2003.  WDec, ¶45.  Up to that

time,  industrial  gas  turbine  users  had  no  alternative  to  the  components

manufactured and sold by GE.  WDec, ¶46.  Chromalloy offered users not only a

better alloy, but also better price, and warranty terms.  WDec, ¶47.  Chromalloy

offered depots and end users initially a 12,000-operating hour or 18-month warranty. WDec, ¶48. In addition, its warranty carried a "downstream damages" provision: "If, solely and directly as result of a defect of a part manufactured by [Chromalloy] . . . [Chromalloy] will reimburse JTS or its Customer for the actual, reasonable, and necessary direct out-of-pocket costs and expenses incurred by JTS or its Customer to repair such [downstream] damage, up to one million dollars ($1,000,000) per occurrence and up to ten million dollars ($10,000,000) in the aggregate." WDec, ¶49. This provision offered additional protection up to $1 million per occurrence for any damage to any engine components that were damaged during engine operation as a result of a defect in the Chromalloy components. *Id.* This was the only Chromalloy warranty applicable to the components Chromalloy sold to JTS in 2005 that JTS installed in the engine that suffered damage on September 3, 2010. WDec ¶50.

## C.   <u>Plaintiff Becomes a Launch Customer</u>

In late 2002, Plaintiff solicited bids for a scheduled replacement hot section. WDec, ¶51. GE and JTS submitted the lowest bids. *Id.* Ed Jackson, as the Combined Cycle Plant Supervisor, evaluated the two bids and recommended Plaintiff accept JTS's lower bid which came with Chromalloy's new single crystal HPT components. *Id.* Jackson's recommendation was based on JTS's lower price for a hot section fitted with new Chromalloy HPT components. *Id.* Jackson also

9

sa5949c.docx

explained that "JTS blades and nozzles are made of a material that significantly outperformed the GE material in laboratory tests", which he said, "could translate into cost savings by increasing the interval between Hot-section repairs." *Id.*

Jackson also emphasized the JTS 18 month warranty that covered consequential damages, which, he reported, Chromalloy was backing with "a multi-million dollar policy." *Id.*  He contrasted this warranty with GE's warranty offering, which covered only the failed part, and not even the labor to replace that part. *Id.*

Ultimately, Plaintiff contracted with JTS to purchase and install the replacement hot section fitted with Chromalloy parts.   WDec, ¶52.   Plaintiff provided detailed specifications to JTS regarding the HPT module, to include coating requirements, warranty, delivery dates, and more.  WDec, ¶53.   In the spring of 2003, Plaintiff became a "launch" customer for the Chromalloy-manufactured HPT components sold by Chromalloy to JTS.  WDec, ¶54.  JTS installed the first components in one of Plaintiff's engines in June 2003.  WDec, ¶55.  Upon installation of the first Chromalloy components, Jackson reported: "the engine started on the first attempt (with no leaks, temperature, or vibration problems!), and has ran (sic) great ever since." *Id.*

In November 2003, pleased with the performance of Chromalloy's product to date, Jackson pressed management to go with Chromalloy for Plaintiff's next

10

hot section replacement: "I also feel that the Chromalloy materials have proved themselves." WDec, ¶56. By this time, GE, essentially copying Chromalloy's state-of-the-art innovation, had introduced its own single crystal hot section components but, Jackson noted, GE offered single crystal only on the first stage of its hot section, not the second stage, unlike Chromalloy. *Id.* He also remarked that "GE's warranty doesn't come close to JTS's." *Id.*; WDec, ¶57.

Plaintiff maintains that it understood it would obtain double the number of operating hours from Chromalloy's HPT components as compared to GE's base HPT components made from Rene 80 alloy, extending the hot section operating hours from roughly from 12,500 hours to 25,000 operating hours. WDec, ¶58. Jackson testified that the doubling of the number of operating hours was one of the benefits Plaintiff expected from using Chromalloy HPT components, and that this was part of the basis of the bargain when Plaintiff contracted with JTS to purchase the Chromalloy components. *Id.*

In June 2004, Jackson resigned his position with Plaintiff, leaving behind a schedule for Plaintiff's anticipated major overhauls and hot section replacements. WDec, ¶59. Jackson estimated that "after 2010" all of Plaintiff's units would be on a 25,000 hot section replacement and 50,000 overhaul schedule. *Id.*

In 2005, Plaintiff hired John Mauri to fill Jackson's vacant position. WDec, ¶60. Shortly after he began his work, Mauri oversaw the purchase of a

11

replacement hot section for the turbine located in the M-14 position fitted with all new Chromalloy HPT components from JTS. WDec, ¶61. These were replacing a mix of GE and Chromalloy components used in this turbine. *Id.* There were no reports of any problems with the Chromalloy components removed from the old hot section of M-14 that had been installed in 2003 – no corrosion, no damper failures and no disk damage. WDec, ¶62. After this installation, four of Plaintiff's five turbines were running with Chromalloy HPT components (only the engine in the peaking M17 position (ESN 481-718) still had GE hot section components). WDec, ¶63.

**D.    Corrosion is discovered on ESN 481-669 in January 2007**

In January 2007, Plaintiff contracted with TransCanada Turbine (TCT), a gas turbine overhaul depot, to perform a 50,000 hour overhaul of ESN 481-669 (M-16). WDec, ¶64. Upon disassembling the engine, TCT observed that blades in the hot section were tightly fused, making them difficult to remove. WDec, ¶65. TCT shipped the blades to Chromalloy for repair and evaluation. WDec, ¶66. Up to this time, Chromalloy had received no reports of corrosion occurring on any of the LM 2500 components it had introduced into the market beginning in 2003. WDec, ¶67. Corrosion in the root area (or the area "below the platform") was very rare. WDec, ¶68. In fact, GE's coating specification does not mandate protective, corrosion-resistant coating of blades in the area below the platform. WDec, ¶69.

(In January 2010, upon removal of the hot section of M-16 for overhaul, there was no report of any corrosion under the platform of the blades or damper failures or disk damage.  WDec, ¶70.)

In March of 2007, at the Western Turbine User's Conference, representatives of Plaintiff, TCT, JTS (who sold the hot section to Plaintiff in 2004 and installed it in 481-669) and Chromalloy met to discuss the matter.  WDec, ¶71. Chromalloy reported its internal study of the blades confirmed the cracking at the root was not caused by its manufacturing, but likely was related to sulfur and other contaminants in the plant environment as well as operation of the turbine itself. WDec, ¶72.  Chromalloy also sent the blades out for an independent metallurgical analysis by Dr. Ramesh Kar.  WDec, ¶73.  Dr. Kar also confirmed Chromalloy's findings.  *Id.*  Chromalloy shared Dr. Kar's report with Plaintiff during a trip to Maui in April 2007.  WDec, ¶74.

Notably, about one year earlier, in February 2006, Plaintiff replaced the HPT components in 481-637 (M14) which had been fitted with Chromalloy HPT components.  WDec, ¶75.  Unlike 481-669, no corrosion was found on the Chromalloy components installed on 481-637.  WDec, ¶76.

After the discussion at the 2007 WTUI conference, Plaintiff elected to examine the hot section of ESN 481-759 for corrosion.  This engine's operating hours were comparable to 481-669, and it was scheduled for hot section exchange

13

later that year.  WDec, ¶77.  Chromalloy and JTS both sent representatives to Maui to observe the removal of the hot section in late April 2007.  *Id.*  Upon removing the HPT module, nothing out of the ordinary was observed on site, and the module was shipped back to JTS for disassembly and closer inspection of the roots of the blades.  *Id.*  JTS later reported to Plaintiff and Chromalloy that it found no corrosion on the roots or other uncoated sections of the blades.  *Id.*

At this point, it appeared to Chromalloy that the corrosion found on ESN 481-669 was an isolated event.  Chromalloy had never been told that Plaintiff had experienced corrosion on other engines, and in particular had never been told that Plaintiff had experience with corrosion on the roots of HPT blades or uncoated areas below the platform.  *Id.*  Given that both its prior hot section replacement (in 2006) and the hot section replacement in 481-759 showed no corrosion, Plaintiff elected to continue operations and not to vary its overhaul or hot section replacement schedules.  Nor did Plaintiff elect to alter its monitoring, inspection or maintenance procedures.  WDec, ¶78.

### E.     The September 3, 2010 Incident

After the inspection of ESN 481-759 and the discovery that it was not affected by corrosion, Plaintiff continued for more than three years to operate its turbines without any incident involving Chromalloy HPT components.  WDec, ¶79.  As can be seen from the following table, Plaintiff selected Chromalloy

14

components for its LM 2500 engines 5 more times after corrosion was found on
ESN 481-669.  WDec, ¶80.

| DATE | ENGINE | REPAIR DEPOT | REPLACEMENT COMPONENTS |
|---|---|---|---|
| May 2003 | ESN 481-759 (M19) | JTS | Chromalloy components |
| October 2003 | ESN 481-637 (M14) | JTS | Chromalloy Stage 1 nozzles and GE components |
| February 2004 | ESN 481-669 (M16) | JTS | Chromalloy components |
| June 2004 | ESN 481-718 (M17) | JTS | GE components |
| February 2006 | ESN 481-637 (M14) | JTS | Chromalloy components |
| October 2006 | ESN 481-677 (MSI) | JTS | Chromalloy components |
| April 2007 | ESN 481-759 (M19) | JTS | Chromalloy components |
| June 2007 | ESN 481-669 (M16) | TCT | Chromalloy components |
| June 2009 | ESN 481-637 (M14) | PGTC | Chromalloy components |
| January 2010 | ESN 481-669 (M16) | PGTC | Chromalloy components |
| April 2010 | ESN 481-759 (M19) | ANZ | Chromalloy components |
| August | ESN 481-718 | ANZ | For installation of |

sa5949c.docx

| 2010 | (M17) | | Hot Section fitted with Chromalloy components, but ultimately fitted with GE Xtend® hardware after blade liberation |
|------|-------|--|-------------------------------------------------------------------------------------------------------------------------|

In June – August 2010, Air New Zealand (ANZ) performed repairs on the turbine mid-frame of the spare engine, ESN 481-677. WDec, ¶81. After repair of the turbine mid-frame, ESN 481-677 was installed in the M17 peaker position. *Id.* Eight days later, on September 3, 2010, after approximately 65 hours of operation since the turbine mid-frame repair, the engine experienced a sudden failure and shut-down. WDec, ¶82. It was later determined that one of the stage 1 HPT blades manufactured by Chromalloy had separated just above the root during engine operation causing extensive damage to the rest of the engine. WDec, ¶83. Plaintiff purchased this replacement hot section from JTS and installed it in 481-677 in October 2006. WDec, ¶84. At the time of the incident, the spare engine's hot section had just over 16,000 operating hours. WDec, ¶85. The warranty offered by Chromalloy on these components, however, had lapsed 18 months after installation. *See* WDec, ¶__. Fortunately, the blade liberation caused no personal injury or other property damage. WDec, ¶86. Plaintiff sent the turbine to ANZ for disassembly. WDec, ¶87. Although a representative from Chromalloy was invited

16

to the disassembly, Chromalloy was not permitted to test or analyze the engine parts.  WDec, ¶88.

ANZ and Plaintiff selected Quest Integrity Group ("Quest") out of New Zealand to conduct a metallurgical investigation.  WDec, ¶89.  Quest issued its report in November 2010, and found that blade #19 in the first stage HPT was the fracture blade.  WDec, ¶90.  It showed signs of corrosion under the platform in an uncoated portion of the blade.  WDec, ¶91.  Quest made three recommendations to Plaintiff: (1) test your fuel; (2) clean your filters to keep contaminants out of the engine, and (3) coat the shank portion of the blade where the cracks from corrosion occurred.  WDec, ¶92.  Quest did not undertake any effort to determine how foreign contaminants managed to enter ESN 481-677.  WDec, ¶93.  Neither Plaintiff nor ANZ engaged anyone else to conduct such an investigation.  WDec, ¶94.

Plaintiff's insurers engaged Herbert Sirois, an engineer, within days of the incident.  WDec, ¶95.  On August 15, 2014, Plaintiff disclosed Sirois as a testifying expert pursuant to Fed. R. Civ. P. 26.  WDec, ¶96.  In his report, Sirois suggests the following theory of causation:

> HPT stage 1 blades were installed in the Maui Electric operating environment with a substandard design where the blades were manufactured with a heavier (more dense) alloy [than General Electric's alloy] and which changed the dynamic behavior of the blades so that the effectiveness of General Electric's originally designed damper seals did not provide the necessary damping of blade

17

> vibration, sealing of cooling air to the HPT stage 1 blades and lastly
> allowed ingestion of hot gases into the space between adjacent blades
> and possibly into the dovetail area of the blades.

WDec, ¶97.  When deposed, Sirois admitted he has no data or empirical evidence to support this theory of causation, but relies instead on his intuition and experience.  WDec, ¶98.

Since Chromalloy first sold LM 2500 HPT components beginning in 2003, more than 13,000 Chromalloy manufactured components have been in use worldwide under a variety of operating conditions.   Declaration of Susan Churchill, ¶¶ 6-7, Exhibits A and B.  No depot or customer, except Plaintiff, has reported an occurrence of corrosion on HPT blades under the platform. Declaration of Binod Singh, ¶¶ 4-5.  Chromalloy also has received no reports of damper failure or disk damage in connection with its Stage 1 and Stage 2 blades, and depot overhaul reports from Plaintiff have shown disks and dampers to be reworked and returned to service.  Singh Dec, ¶5; WDec, ¶99.

### F.    Plaintiff's Operations, Environment, and Maintenance Practices

Shortly after it was commissioned in 1995, Plaintiff's M14 base load turbine, ESN 481-637, was found to be ingesting unfiltered air containing concentrations of sodium, magnesium, calcium, and chlorides.  WDec, ¶100.  In 1996, Plaintiff retained Power & Compression Systems ("PC&S") to test and evaluate its inlet air filters.  WDec, ¶101.  P&CS reported that "exposure to salts

18

(sodium, potassium, magnesium) does not have to be continuous to be detrimental" and that "sporadic exposure to salt concentrations will result in 'hot corrosion' of turbine blades and nozzles." *Id.*

In a June 2003 email sent to a GE Customer Satisfaction Manager, Ed Jackson stated the following: "I realize that there is corrosion and erosion and things in the environment to cause [parts failure].  I am unsatisfied with 12,500 hours. . . .  Should I be satisfied with 12,500 hours because GE says that is all I should get out of them?  Should I not look for ways to extend the maintenance life of these units thereby saving my company money?"  WDec, ¶114.

Plaintiff had experienced corrosion on its turbine components and routinely used special corrosion-resistant coating to extend component life.  *Id.*  In a March 7, 2003 email to a GE Customer Service Representative, Jackson stated that Plaintiff "experience[ed] accelerated corrosion/erosion on hot-section components and the first three stages of [its] low pressure turbines."  WDec, ¶115.  Jackson reported that "higher than normal concentrations of sulfur in the air contributes to increased corrosion in our turbines" and that the "sulfur most likely comes from the volcano."  *Id.*

Sixteen years the first inspection of filters on M-14, Plaintiff engaged P&CS to inspect its air filtration systems on all four packages.  WDec, ¶102.  P&CS's report concluded Plaintiff's canister and barrier filter systems on all engine

packages performed below the manufacturer's predicted levels.  WDec, ¶103.  As it relates to M17 where the spare was operating when the blade liberated, the barrier filter sections for the M17 gas turbine all performed below expectations. *Id.*  Indeed, P&CS characterized two M17 filter sections as suffering "complete filter failure." *Id.*  When describing the condition of the M17 barrier filter, P&CS concluded: "the filter is not performing at all." *Id.*  P&CS found that chlorides on the filter elements at levels unacceptable for gas turbine ingestion.  *Id.*  It recommended Plaintiff take action to improve the overall effectiveness of its inlet air filter system by, among other methods, testing the air in the clean air plenum for contaminants such as sodium, potassium, lithium, magnesium, and calcium, and servicing its failed filters. *Id.*

Corrosion was a known problem for Plaintiff's turbines.   WDec, ¶104.  Testifying for Plaintiff, Mauri claimed that Plaintiff conducted borescoping to view the components of its hot sections, but kept few records of the results of those inspections WDec, ¶105.[3]  Mauri claims Plaintiff visually inspected its air filters to ensure that they were functioning properly, but again, no records were maintained.  WDec, ¶107.   Mauri also claims that Plaintiff regularly washed its turbines, as

---

[3]  A borescope is an optical device consisting of a flexible tube that is inserted into the engine through various ports.  It allows the technician to view the engine's condition either through an eyepiece or on a monitor.  Borescoping is one form of predictive or preventive maintenance.  WDec, ¶106.

sa5949c.docx

required by the engine's manufacturer, but again there is little if any documentation of that. WDec, ¶108.

NAES Corporation assessed the operations, maintenance, and training at Plaintiff in February 2010. WDec, ¶109. It noted many discrepancies, but in particular, there was no computerized maintenance management system in place that would provide an electronic record of maintenance tasks, such as borescope inspections, engine washing, etc. *Id.*

In addition, NAES noted that Plaintiff's personnel failed to take engine alarms seriously: "The operator in the control room printed out all DCS alarms. It consisted of eight pages or approximately 300 alarms. . . . When the operator was asked, what he does when an alarm comes in he reported -- I acknowledge and put it in the logbook. Several of the alarms appear to be critical and need immediate attention or assistance." WDec, ¶110.

This last observation is of particular note. In August 2007, ESN 481-637 suffered a failure requiring major repair. WDec, ¶111. Post incident investigation revealed that Plaintiff's operating personnel continued to run the engine for more than six hours after the alarm sounded, even though the condition required immediate shut down and investigation. *Id.* Brian Hulse, a supervisor at JTS and lead investigator on the damage to ESN 481-637, noted that he had observed another incident at Plaintiff's facility of failure to respond to an alarm triggered by

21

a "stall" condition in the engine that mandated engine shutdown.  *Id.*  ESN 481-677, the subject of this litigation, was also being operated in an alarm condition at the time of the blade liberation, in that the engine's HPT temperature exceeded maximum limits allowed by the manufacturer.  WDec, ¶112.

### G.      Plaintiff's Failure to Preserve/Produce Evidence

Upon completion of Quest's analysis, Plaintiff retained only HPT blades and dampers from ESN 481-677, but no other engine components.   WDec, ¶116. Chromalloy is prejudiced by its inability to examine the physical evidence. Plaintiff's own experts recognized the importance of this evidence.   In an email dated October 15, 2010, Sirois specifically requested that ANZ or Quest analyze the deposits seen on the compressor blades of the engine.  This could reveal, e.g., the type of contaminants, their origin, and route of entry.   The compressor components are no longer available for examination by Chromalloy.  Plaintiff also failed to preserve the spare's HPT vanes.  These components could provide details regarding the conditions to which the hot section was subjected during engine operation.  Chromalloy's experts requested an opportunity to examine all available engine components from the spare because, like pieces of a puzzle, they could identify not only the cause-in-fact of the blade fracture, but its proximate cause as well.

sa5949c.docx

Plaintiff's expert Sirois has proffered a design defect theory that Chromalloy's alloy adversely affected dampers. *See* WDec, ¶96. Yet, despite having possession of all the dampers for all five of its engines, Plaintiff retained only dampers from the spare. None of the other dampers has been preserved, and Chromalloy is unable to examine them to determine whether they show signs of abnormal wear or damage as Sirois claims they would.[4]

Plaintiff collected data during the operation of its turbines, showing the turbines' temperatures, pressures, power output, engine speed, fluid flow rates, and more. This data reveals the engine's condition at any given moment. *Id.* Chromalloy has received only a sliver of this information as it pertains to the spare. Chromalloy has demanded all data retained by the Plaintiff pertaining to this engine for specific parameters, but Plaintiff has refused to produce more, claiming burden. This evidence is important to understanding the treatment given this engine, and whether it was abused, while operating with Chromalloy HPT components.

---

[4] Chromalloy, in its Motion to Exclude Report and Testimony of Herbert Sirois, has asked the Court to bar Mr. Sirois from offering any opinions on causation or defect due to the failure to preserve dampers. Regarding this and other evidence that was not made available to Chromalloy, it intends to file a motion for sanctions, in which it will ask the Court to consider the relevant facts and circumstances and enter an order of sanctions as appropriate.

23

### H.    Plaintiff's Economic Damages

Plaintiff claims that it suffered losses of $4,109,072.02. WDec, ¶113. Of this, Plaintiff spent $3,319,555.65 on engine repairs, $639,472, to lease a replacement turbine while 481-677 was in the shop, and the balance, $150,044.37, for travel, labor, administrative work and "expert costs" associated with the spare's repair. *Id.*[5]

## II.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment should be granted when no genuine issue of material fact exists on the record. Fed. R. Civ. P. 56(c). "One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses." *McNally v. Univ. of Hawaii*, 780 F. Supp. 2d 1037, 1046 (D. Haw. 2011), citing *Id.* (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish an essential element at trial. *Id.*

---

[5] Chromalloy disputes these damages, which are grossly inflated. Among other reasons, they reflect costs to restore this engine to a new, zero-time condition. Chromalloy cannot be responsible for a completely new engine, given that Plaintiff received the benefit of an engine that ran for 16,000 hours before it was damaged.

**B.** **Chromalloy Is Entitled to Summary Judgment on the
Plaintiff's Negligence, Strict Liability, and Negligent
Misrepresentation Claims Because They are Barred by the
Economic Loss Rule**

Hawaii follows the economic loss rule, namely, that purely economic losses
are not recoverable in actions sounding in negligence or strict liability. *Keahole
Point Fish LLC v. Skretting Canada Inc.*, 971 F. Supp. 2d 1017, 1028 (D. Haw.
2013); *Baker v. Castle & Cooke Homes Hawaii, Inc.*, CIV. 11-00616 SOM, 2012
WL 1454967, at *7 (D. Haw. Apr. 25, 2012) (Mollway, J.).   Economic losses in
Hawaii include: (1) costs of repair or replacement of the defective product; (2) lost
profits; and (3) consequential damages. *Keahole Point Fish LLC*, 971 F. Supp. 2d
at 1029; *Ass'n of Apartment Owners of Newtown Meadows ex rel. its Ass'n of
Apartment Owners of Newtown Meadows ex rel. its Ass'n of Apartment Owners of
Newtown Meadows ex rel. its Bd. of Directors v. Venture 15, Inc.*, 167 P.3d 225
(2007), as corrected on denial of reconsideration (Sept. 20, 2007).    Stated
differently, in Hawaii, a plaintiff can only recover for personal injuries and damage
to other property under tort theories; all other losses are barred by the economic
loss rule. *Id.*

At bar, there is no privity between Plaintiff and Chromalloy insofar as
Plaintiff contracted with JTS for the purchase of hot sections with Chromalloy
parts.  That, however, presents no bar to application of the economic loss rule since
the requirement for contractual privity has been eliminated in Hawaii. *Id.* at 292.

25

sa5949c.docx

It is not disputed, moreover, that the Chromalloy warranty that applied to the transaction by which Plaintiff acquired the hot section for ESN 481-677 is set forth in Exhibit 106. That offered protection to customers of JTS, including Plaintiff, against defects in workmanship and materials for 12,000 hours or 18 months. That warranty expired long before the failure of ESN 481-677 on September 3, 2010.

> 1. PLAINTIFF'S NEGLIGENCE AND STRICT LIABILITY COUNTS ARE BARRED BY THE ECONOMIC LOSS RULE BECAUSE THEY SEEK RECOVERY FOR PURELY ECONOMIC LOSSES ASSOCIATED WITH DAMAGE TO AN INTEGRATED PRODUCT

In the products liability context, Hawaii courts examine the object of the parties' bargain from the buyer's perspective to determine the product at issue. *Exxon Shipping Co. v. Pac. Res., Inc.*, 835 F. Supp. 1195, 1199 (D. Haw. 1993). In essence, this is concerned with what the buyer hoped to get out of the transaction. *See Baker*, 2012 WL 1454967 at *9 (a person buying a home bargains for a finished home, not just concrete). This test is not a "mechanical or formalistic determination of whether the injuring and injured components were sold under the umbrella of the same contract." *Exxon Shipping Co.*, 835 F. Supp. at 1201. Rather, the court must determine the parties' real objective. *Id.*

Thus, the economic loss rule will apply where "the defective product is a component of an integrated system/structure and causes damage to other components of the system/structure because the damage is to the defective product

sa5949c.docx

itself, not 'other property.'" *Keahole Point Fish LLC*, 971 F. Supp. 2d at 1029. Importantly, the product cannot be narrowly defined. "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property' damage in virtually every cause where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." *Exxon Shipping Co.*, 835 F. Supp. at 1199.

Plaintiff contracted with JTS to purchase products and services for its LM 2500 engines. This included replacement hot sections fitted with Chromalloy components that were installed in the LM 2500s pursuant to a program adopted by Plaintiff to convert all of its engines to better technology. That these hot sections were replacement components cannot defeat application of the economic loss rule. Where replacement components are contemplated by the buyer, the economic loss rule will still apply. *See Exxon Shipping Co.*, 835 F. Supp. at 1201 ("An integrated product may have any number of components replaced with spare parts in the ordinary course of events. To hold that these parts are 'other property' would lead to absurd results"). It is not disputed that Plaintiff purchased the JTS hot sections as replacements for hot sections that were wearing out and in need of replacement. It is also not disputed that the hot sections in this case were purchased by Plaintiff

27

and installed on the schedule set by Plaintiff based on Plaintiff's expectation as to the time those components would need to be overhauled.[6]

What's more, the record establishes that Plaintiff viewed the engine as an integrated product.  Plaintiff contracted with JTS to install a hot section module into its LM2500 engines and provide technical assistance to ensure a functioning engine.   Given the Plaintiff's intended use of the hot section, Chromalloy's components had no use or value to Plaintiff except as part of a working engine.  In addition, Plaintiff contracted with JTS for a functioning engine.   To view the commercial dealings between JTS and Plaintiff as somehow limited to the purchase and sale of a hot section without regard to its ultimate purpose ignores the full scope of JTS's services for which Plaintiff contracted.

Importantly too, in the event of a failure of the Chromalloy components, Plaintiff expected contractual protection pursuant to the warranty JTS offered (and Chromalloy backed) for damage to any other part of the engine occurring during

_____

[6] Replacement of Plaintiff's hot sections fitted with Chromalloy parts is also consistent with section 7.2 of the Master Services Agreement entered into between Plaintiff and JTS, requiring JTS to notify Plaintiff in the event of technological improvements.  Peter LoBello, President of JTS, executed the MSA for JTS and testified that Chromalloy's single crystal technology was an example of the technological improvements contemplated by section 7.2.  This provision was intended by Plaintiff to permit it to make changes or replacements in the event of improvements in technology, not merely when components wore out.  *Cf. Windward Aviation, Inc. v. Rolls-Royce Corp.*, CIV. 10-00542 ACK, 2011 WL 2670180 (D. Haw. July 6, 2011) (economic loss rule inapplicable where component replaced prior to end of useful life and no evidence that parties intended replacement for other reasons).

28

the warranty period, up to the aggregate limit of $10 million.   Thus, the entire engine was covered by JTS's warranty in the event of a failure of a Chromalloy component.   The contract itself defines the engine as an integrated product, which is exactly what Plaintiff bargained for.   The economic loss rule was designed to prevent plaintiffs from making an end run around the bargained for exchange.

Plaintiff's losses – $3,319,555.65 in repair costs to ESN 481-677, $639,472.00 for a leased engine, and $150,044.37 in miscellaneous travel, labor, administrative, and expert costs – are economic losses under controlling law.   The repair costs fall exactly within the contracted language and expectation of the parties at the time Plaintiff elected to purchase JTS hot sections fitted with Chromalloy components.   These repair/replacement costs, lease and other consequential losses are not recoverable under tort theories.   Chromalloy is thus entitled to summary judgment on Count I and Count II of Plaintiff's First Amended Complaint.

<p style="margin-left:2em">2.   <u>THE ECONOMIC LOSS RULE ALSO BARS PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM BECAUSE IT TOO SEEKS RECOVERY FOR PURELY ECONOMIC LOSSES AND IS PREMISED ON DUTIES ARISING OUT OF THE TRANSACTION AT ISSUE.</u></p>

Under current Hawaii law, negligent misrepresentation claims will not stand if premised solely on allegations that one party failed to fulfill its part of the bargain and the losses are purely economic.   *See Hawaii Motorsports Investment,*

sa5949c.docx

*Inc. v. Clayton Group Services*, No. 09-304 SOM/BMK, *Hawaii Motorsports Inv.,*
*Inc. v. Clayton Grp. Servs.*, CIV. 09-304 SOM/BMK, 2009 WL 3109941, at *4 (D.
Haw. Sept. 25, 2009).  In *Hawaii Motorsports Inv., Inc.*, 2009 WL 3109941, this
Court applied Venture 15 in dismissing negligent misrepresentation claims brought
by a plaintiff against a defendant who lacked privity with the Plaintiff.  In Hawaii
Motorsports, the plaintiff sued a consultant who had provided an environmental
assessment for a third-party interested in purchasing the Hawaii Raceway Park
from Plaintiff.  This Court found that the economic loss rule barred plaintiff's
negligent misrepresentation claim where it was predicated on contractual duties
owed by the defendant to the third party, and only economic losses resulted.  *Id.* at
*4 – *5.

       The economic loss rule, likewise, bars negligent misrepresentation claims in
products liability actions, like the instant action, where the Plaintiff alleges purely
economic loss, and where the duties breached amount to a failure to perform
contractual obligations.  In *Cardwell v. Netherland*, 971 F. Supp. 997, 1017 (E.D.
Va. 1997), the plaintiff, a fish farm operator, asserted claims for negligence, strict
liability and negligent misrepresentation against a producer of defective feed.  *Id.*
The plaintiff sought to recover damages for lost revenue, actual feed cost, and
other unspecified additional costs.  *Id.* at 1031.  The District Court concluded that
these damages were solely economic and held that the economic loss rule bars

30

Plaintiff's negligence, products liability, and negligent misrepresentation claims. *Id.*

Venture 15, *Hawaii Motorsports*, and *Keahole* are on point and warrant summary judgment on Plaintiff's negligent misrepresentation claim. Importantly, as Chromalloy has shown supra, Plaintiff's losses are purely economic losses. Plaintiff has not alleged any personal injury as a result of the damage to ESN 481-677. And, there is no damage to other property. The turbine engine was an integrated product. The hot sections fitted with Chromalloy components were replacements purchased by Plaintiff through transactions with JTS, according to Plaintiff's replacement schedule, and for which Plaintiff sought functioning turbines through the provision of technical services for which Plaintiff contracted with JTS. In addition, Plaintiff contracted with JTS for a warranty that provided coverage for exactly the type of loss Plaintiff experienced in this case. Had that warranty still been in effect, assuming compliance with the warranty's requirements, Plaintiff's loss would have resulted in a warranty claim, not a federal lawsuit.

Regarding the allegations of negligent misrepresentation, Plaintiff's claims mirror those of the Plaintiff in *Hawaii Motorsports*. There, plaintiff alleged negligent misrepresentation in the manner in which the defendant performed its duties to the third-party, claiming that the defendant failed to perform as promised.

31

sa5949c.docx

*Hawaii Motorsports*, 2009 WL 3109941 at \*5.  "Essentially, [plaintiff] alleges that it lost the benefit of its bargain with [third-party]" as a result of the alleged misrepresentation which was nothing more than a failure to perform.  *Id.* Likewise, Plaintiff's negligent misrepresentation claims here are nothing more than claims that Chromalloy's product failed to perform as promised in the warranty extended to JTS, and Plaintiff lost the benefit of its bargain with JTS as a result.

Plaintiff cannot avoid application of the economic loss rule by artfully pleading a negligent misrepresentation claim asserting the same duties that would have given rise to a breach of contract or warranty claim.  To allow this undermines the rule, and raises the very same policy concerns that led the Hawaii Supreme Court to limit the exception for negligent misrepresentation.  *See City Exp., Inc. v. Express Partners*, 87 Haw. 466, 959 P.2d 836, 840 (1998) (blurring the line between contract and tort, and imposing liability beyond that which was agreed upon at the time of the transaction at issue).  Plaintiff is seeking to recover in tort for purely economic loss resulting from a product that did not measure up to Plaintiff's expectations as to quality, which Hawaii law does not allow.  For these reasons, as with Counts I and II, Chromalloy is entitled to summary judgment on Count III, Plaintiff's negligent misrepresentation claim.

sa5949c.docx

**C.**   **Summary Judgment Should be Granted to Chromalloy on Plaintiff's Negligence and Strict Liability Counts because Plaintiff has Failed to Adduce Evidence that Chromalloy's Product was Defective or that it Caused Plaintiff's Losses.**

Even assuming that Plaintiff's claims were not barred by the economic loss rule, Plaintiff's negligence and strict liability claims cannot proceed because Plaintiff has failed to show that Chromalloy's product was defective, or that it was otherwise negligent, or that Chromalloy's conduct caused Plaintiff's losses.   In Hawaii, "a products liability claim based on either negligence or strict liability has three elements: (1) a duty to anticipate and design against reasonably foreseeable hazards; (2) breach of that duty; and (3) injury proximately [i.e. legally] caused by the breach." *Baker*, 2012 WL 1454967 at *10, citing *Tabieros v. Clark Equip. Co.*, 85 Haw. 336, 944 P.2d 1279, 1313 (1997).   "An act or omission is a legal cause of an injury/damage if it was a substantial factor in bringing about the injury/damage." *Tabieros*, 944 P.2d at 1313.

1.   PLAINTIFF'S EXPERTS HAVE NO BASIS FOR OPINING AS TO DEFECT OR CAUSATION.

On August 15, 2014, pursuant to Rules 16 and 26 of the Federal Rules of Civil Procedure, Plaintiff produced reports from two experts, Herb Sirois, an engineer, and Jeffrey Smith, a metallurgist.   Notably, neither expert offers the opinion that Chromalloy was negligent or that its product was defective for failure to coat the lower shank area of its HPT blades.   This claim was a central feature of

33

the Plaintiff's initial complaint.  Since then, Plaintiff has learned that Chromalloy coats its HPT blades in the same manner as GE.  Neither company coats the lower shank.

Smith offers no opinions as to either causation or defect as it relates to Chromalloy's HPT components.  In summary, Smith opines as follows: that Type II hot corrosion was found on Chromalloy components that had been operating in several of the Plaintiff's LM 2500 engines; Chromalloy did not perform enough validation or testing (aerodynamic, temperature, and corrosion testing) before marketing its components; and Chromalloy's personnel are inexperienced and did not provide the level of support expected of an original equipment manufacturer. *See* Exhibit 171, at 17-18.

A careful reading of Smith's report reveals not only that he has no opinion that Chromalloy caused the Plaintiff's losses, but also he has no opinion on causation period.  Referring to the Quest Report, he states that "[t]he cause of the 481-677 (MS1) blade failure was identified as Type 2 hot corrosion in the uncoated shank area. . . ." *Id.* at 16.  Nowhere in his report does he say that he agrees with this, or that he bases any causation opinion of his own on this information.  Significantly, Smith did not even examine blade #19, the HPT blade that fractured and caused the damage to ESN 481-677.  *See Id.* at 10 (84 of 88 possible stage 1 blades from ESN 481-677).  Having failed to examine the very blade that broke, it

34

is not surprising that he is unable to offer any opinions on causation or product defect.

Plaintiff's remaining expert, Sirois, was less reluctant to offer opinions on causation or defect. But Sirois' opinions and conclusions are unreliable and therefore inadmissible under Federal Rule of Evidence 702. Sirois claims Chromalloy's HPT blades impacted the "effectiveness" of the dampers, thus promoting corrosion. *See supra* at 15. Sirois testified, however, that he has done no testing to confirm this theory; he relies upon no study, or peer-reviewed literature in support. Instead, he relies upon "intuition" and his 43 years of experience. Sirois Deposition, Exhibit 95:14-96:9.

Sirois also testified that Chromalloy was negligent for not considering limitations on dampers:

> Chromalloy did not anticipate degradation of the damper seals when operated for a greater than 12,500 hours operating cycle before inspection of the HPT. Degradation of the damper seals led to . . . increased cooling air flow from the compressor discharge and into "the stage 1 blade area due degradation and failure of as many as 19 stage 1 damper seals . . . .

*Id.* at 5. Like the previous opinion, this opinion is supported by no data, no study, no research Sirois or anyone else performed outside the confines of this litigation. He conceded that GE does not publish life expectancy data on its dampers. Dampers can be reused as long as they meet inspection requirements and are in serviceable condition. Sirois Deposition, 101:15 – 103:2. For a more detailed

35

sa5949c.docx

analysis of Sirois' opinions, and their (in)admissibility, Chromalloy refers the Court to its Motion to Exclude Report and Testimony of Herbert J. Sirois, brought under Fed. R. Evid. 702 and filed separately.

In that Motion, Chromalloy notes its ability to defend itself against Sirois' theory is prejudiced as a result of this failure to retain evidence. Sirois surely knew within days of the failure of 481-677, that this evidence was highly relevant to the issues in this case and his theories of causation. Plaintiff had a duty to preserve that evidence, and failed to do so. *See Ritchie v. United States*, 451 F.3d 1019, 1024 (9th Cir. 2006). Under the circumstances, it would be patently unfair to permit Plaintiff to offer Sirois' theories on causation or defect. His report and testimony should be barred for this reason alone.

> 2. PLAINTIFF HAS NO OTHER EVIDENCE ESTABLISHING CAUSATION, THAT CHROMALLOY WAS NEGLIGENT, OR THAT ITS PRODUCT IS DEFECTIVE.

Unable to rely on its expert witnesses for proof of causation, negligent manufacture, negligent design, or product defect, Plaintiff must look elsewhere for evidence that establishes a genuine issue of material fact. The only other possible evidence in the record is the Quest Report, Exhibit 17. As this Court has noted, however, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." *McNally*, 780 F.Supp.2d at 1046.

sa5949c.docx

To begin with, the Quest Report is hearsay, and cannot be used independently to establish product defect, negligence, or causation.  Were Plaintiff to rely on statements in the Quest Report to establish causation, defect, or Chromalloy's negligence, those statements would fall squarely within the definition of hearsay – an out of court statement offered for its truth.  *See* Fed. R. Evid. 801(c).  Also, to the extent statements in the Quest Report reference information supplied by others to Quest (e.g., the circumstances prevailing at the Plaintiff's plant, the condition of the engine post-incident, coating standards, damper function, etc.), those statements would be hearsay in themselves.  In short, the Quest Report is rife with hearsay and cannot be considered as evidence establishing a genuine issue of material fact.

Evidentiary objections aside, there is only one statement in the Quest Report that arguably relates to Chromalloy, and that is the recommendation to "[u]se blades which have a protective coating in the lower shank area."  Exhibit 17 at 2.  This statement says nothing, however, about whether the coating of Chromalloy's HPT blades deviated from expected norms or otherwise rendered the product defective.  In fact, as noted in its Motion to Exclude the Report and Testimony of Herbert Sirois, neither of Plaintiff's experts has offered the opinion that Chromalloy's coating constituted a defect or evidence of negligence, most likely because Plaintiff has learned that Chromalloy follows coating specifications

37

supplied by GE, the original equipment manufacturer. Because the Quest Report is

inadmissible, and, in any event, contains no evidence of negligence or product

defect, it cannot suffice to create an issue of fact.

## III.   CONCLUSION

Plaintiff's claims are barred in their entirety by the economic loss rule. Its

losses are purely economic, and thus not recoverable under tort theories. Summary

judgment is warranted on Counts I, II, and III of Plaintiff's First Amended

Complaint. Plaintiff furthermore has no evidence that Chromalloy's conduct was

negligent, or that its product was defective. Thus, summary judgment is also

warranted on Counts I, and II of Plaintiff's First Amended Complaint.

DATED: Honolulu, Hawaii, December 4, 2014.

By:   /s/ Alan Van Etten
ALAN VAN ETTEN
DEELEY KING PANG & VAN ETTEN
      -and-
STEPHEN A. WOOD
CHUHAK & TECSON, P.C.
Attorneys for Defendant/Third-Party Plaintiff
CHROMALLOY GAS TURBINE, LLC