IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAUI ELECTRIC COMPANY, LIMITED, a Hawaii corporation,<br><br>        Plaintiff,<br><br>  vs.<br><br>CHROMALLOY GAS TURBINE, LLC, a Delaware limited liability company,<br><br>        Defendant.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 12-00486 SOM-BMK<br><br>ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF CHROMALLOY GAS TURBINE, LLC, WITH RESPECT TO COUNTS I AND II OF THE FIRST AMENDED COMPLAINT BUT DENYING SUMMARY JUDGMENT WITH RESPECT TO COUNT III OF THE FIRST AMENDED COMPLAINT; ORDER GRANTING THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO THE EXTENT THE THIRD-PARTY COMPLAINT SEEKS CONTRIBUTION AND INDEMNIFICATION IN CONNECTION WITH COUNTS I AND II OF THE FIRST AMENDED COMPLAINT; ORDER DENYING MOTIONS TO SEAL DOCUMENTS AND MOTION TO EXCLUDE OPINIONS OF HERBERT SIROIS, BUT GRANTING REQUEST TO REDACT LIMITED INFORMATION FROM OPPOSITION BY MAUI ELECTRIC COMPANY, LIMITED |

**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF CHROMALLOY GAS TURBINE, LLC, WITH RESPECT TO COUNTS I AND II OF THE FIRST AMENDED COMPLAINT BUT DENYING SUMMARY JUDGMENT WITH RESPECT TO COUNT III OF THE FIRST AMENDED COMPLAINT; ORDER GRANTING THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO THE EXTENT THE THIRD-PARTY COMPLAINT SEEKS CONTRIBUTION AND INDEMNIFICATION IN CONNECTION WITH COUNTS I AND II OF THE FIRST AMENDED COMPLAINT; ORDER DENYING MOTIONS TO SEAL DOCUMENTS AND MOTION TO EXCLUDE OPINIONS OF HERBERT SIROIS, BUT GRANTING REQUEST TO REDACT LIMITED INFORMATION FROM OPPOSITION BY MAUI ELECTRIC COMPANY, LIMITED**

I.       **INTRODUCTION.**

This action concerns the destruction of a gas turbine engine owned and operated by Plaintiff Maui Electric Company, Limited ("MECO").  In its First Amended Complaint, MECO alleges that the destruction of the engine was caused by a defective high pressure turbine blade manufactured by Defendant Chromalloy Gas Turbine, LLC.  Seeking more than $4 million in damages, MECO asserts claims of negligence (Count I), strict liability (Count II), and negligent misrepresentation (Count III).

Chromalloy seeks summary judgment on all claims.  See ECF No. 201.  Third-Party Defendants Jet Turbine Service LLC and Wood Group Pratt & Whitney Industrial Turbine Services, L.C.C., join in the motion, and, to the extent the motion is granted, request summary judgment with respect to the claims for indemnification and contribution contained in Chromalloy's Third-Party Complaint.  See ECF Nos. 197 and 251.  The court grants summary judgment to Chromalloy with respect to the negligence and strict liability claims asserted in Counts I and II of the First Amended Complaint, determining that the economic loss doctrine bars those claims.  The court denies summary judgment with respect to the negligent misrepresentation claim asserted in Count III of the First Amended Complaint.  Third-Party Defendants' motion is correspondingly granted in part and denied in part.  The court denies as moot the motions to seal documents

unrelated to this ruling, ECF Nos. 220 and 276, and the motion to
exclude the opinions of Herbert Sirois, ECF No. 222.

II.      **BACKGROUND.**

MECO bought five LM2500 gas turbine engines from
General Electric ("GE") and used them to create electricity at
its Ma`alaea Power Station.  See Videotaped Deposition of John
Mauri at 16-17, ECF No. 272-4, PageID # 5019.  Three of the
turbines ran continuously; a fourth was used only when extra
electricity was needed.  Id. at 17.  The fifth engine, which is
the subject of this action, was used as a spare.

An LM2500 gas turbine engine uses a high pressure
turbine, or hot section, which is fitted with Stage 1 and Stage 2
blades and vanes.  The high pressure turbine, located immediately
downstream of the combustion section of the engine, is subjected
to considerable stress when the engine is operating.  See
Chromalloy's First Amended Concise Statement ¶ 2, ECF No. 204,
PageID # 1910; Maui Electric's Response to First Amended Concise
Statement ¶ 2, ECF No. 268, PageID # 4540 (admitting same).  The
high pressure turbine therefore must be replaced more frequently
than other parts of the engine.  See Chromalloy's First Amended
Concise Statement ¶ 3, ECF No. 204, PageID # 1910; Maui
Electric's Response to First Amended Concise Statement ¶ 3, ECF
No. 268, PageID # 4540 (admitting same).  Improving the
performance and durability of the high pressure turbine portion

of an LM2500 gas turbine engine extends the life of the entire engine.  Id.

Chromalloy constructs high pressure turbine blades and vanes that fit into GE's LM2500 gas turbine engines.  See Chromalloy's First Amended Concise Statement ¶ 5, ECF No. 204, PageID # 1910; Maui Electric's Response to First Amended Concise Statement ¶ 5, ECF No. 268, PageID # 4540 (generally admitting same).

Edward Jackson, of MECO, says that in 2002 he learned from Third-Party Defendant Jet Turbine Service LLC that Chromalloy had reverse-engineered a high pressure turbine "blade and vane package alternative to the GE original high pressure turbine."  Decl. of Edward Jackson ¶ 8, ECF No. 269-3, PageID # 4577.  Jet Turbine said that the Chromalloy replacement parts lasted longer, cost less, and came with a better warranty than the GE parts.  Id.

In the fall of 2002, Jet Turbine submitted a bid to replace the high pressure turbine in MECO's LM25000 gas turbine engines using Chromalloy blades and vanes.  Id. ¶ 9.  Jackson says that he recommended that MECO acquire a "Chromalloy equipped hot section" from Jet Turbine that would allow MECO to save considerable money by extending replacement intervals from between 12,000 and 16,000 operating hours to 25,000 operating hours.  Id.

4

In 2003, Jackson attended a Western Turbine User's conference at which Joe Lesch of Chromalloy announced that Chromalloy's blades and vanes for the LM2500 gas turbine engine were expected to "as much as double the life of a hot section when compared to the original blades and vanes." Id. ¶ 11. While Jackson understood that the total number of operating hours would depend on operating conditions, he felt that the estimate of 25,000 operating hours was reasonable given MECO's experience of getting 16,000 operating hours using the original GE parts. Id.

In 2003, MECO purchased high pressure turbine equipment with Chromalloy blades and vanes from Jet Turbine. MECO's first LM2500 gas turbine engine with Chromalloy blades and vanes went into service in May 2003. Id. ¶ 10. In October 2006, MECO installed a new Chromalloy-equipped high pressure turbine from Jet Turbine in its spare LM2500 gas turbine engine. See Decl. John Mauri ¶ 11, ECF No. 269-1, PageID # 4564; MECO's Answers to Second Request for Interrogatories at 16, ECF No. 198-2, PageID # 1660 (indicating that installation of the spare engine hot section with Chromalloy parts occurred on October 5, 2006).

In early 2007, MECO sent a Chromalloy-equipped high pressure turbine from one of its LM2500 gas turbine engines to TransCanada Turbines so that it could be exchanged for another

one.  See Mauri Decl. ¶ 12.  MECO subsequently learned that the
blades in the engine contained cracks.  Id.

In March 2007, MECO's John Mauri met with
representatives from Chromalloy and Jet Turbine at a Western
Turbine Users conference to discuss the cracks in the blades.
Id.  Chromalloy's David Lee, Gary Noah, and Susan Churchill
reportedly told Mauri that the cracks resulted from hot corrosion
under the blades' platform.  Id., PageID #s 4564-65.  Chromalloy
representatives shared with Mauri a report by Dr. Ramesh Kars, a
metallurgist, concerning that hot corrosion.  Id. ¶ 13, PageID
# 4565.

Mauri says he asked Chromalloy to send representatives
to the MECO power plant to provide more information as to why the
blades had corrosion damage, as well as to make recommendations
on the number of operating hours that MECO could expect from the
Chromalloy-equipped high pressure turbines.  Id. ¶ 14.  On April
21, 2007, Lee and Noah visited MECO's plant and inspected another
engine.  Noah reportedly told Mauri that the corrosion likely
resulted from issues relating to that particular engine, and that
Chromalloy did not expect corrosion in the other MECO engines.
Id.  Indeed, Lee and Noah told Mauri that they saw no evidence of
corrosion on the other engine they inspected.  Id. ¶ 17, PageID
# 4566.

Given Chromalloy's assurances that the corrosion was an isolated incident, MECO continued to expect that the hot section of the turbine would operate for 24,000 to 25,000 hours before needing to be replaced.  Id. ¶ 18, PageID # 4567.

On September 3, 2010, a little less than four years after installation, a Chromalloy blade in the high pressure turbine in MECO's spare LM2500 gas turbine engine broke off.  Id. ¶ 20.  The spare engine had been running for only 16,195 operating hours.  Id. ¶ 21, PageID # 4568.  The broken blade damaged the high pressure turbine containing the Chromalloy parts, as well as other parts of MECO's spare LM2500, including the low pressure turbine.  Id. ¶ 22, PageID # 4569.

In the present lawsuit, MECO claims damages related to the engine.  In other words, MECO does not claim that the blade failure caused personal injury or property damage to anything other than the engine.  See Depo. of Mark Nakayama at 86, ECF No. 205-6, PageID # 2019; Chromalloy Concise Statement ¶ 25, ECF No. 204, PageID # 1913; Maui Electric Response to Concise Statement ¶ 25, ECF No. 268, PageID # 4543 (admitting same).

At the time of the incident, Chromalloy's warranty for its parts had expired.  See ECF No. 214-2, PageID # 2514 (warranty expired at the earlier of 12,000 operating hours or 18 months after installation).

Quest Integrity Group investigated the cause of the
incident.  See Mauri Depo. at 162-164, ECF No. 211-3, PageID
# 2202.  Quest concluded:

> 1.   The cause of the failure of the HPT
>      Stage 1 blades from engine ESN 481-677
>      was due to a Type II corrosion-fatigue
>      followed by overload.
>
> 2.   Localised [sic] attack in the form of
>      corrosion "fingers" was observed in the
>      shank, particularly at the bottom ½ of
>      the shank which was not coated.  The
>      corrosion attack observed was consistent
>      with transition-type (Type II) hot
>      corrosion.
>
> 3.   The fatigue damage was generated from
>      the in-service cyclic loadings.  Failure
>      of dampers may have added to the
>      (cyclic) stresses present on the blades.
>
> 4.   The deposits analysed [sic] for the
>      uncoated portions of the shank contained
>      potassium and sulphur.  The source of
>      these contaminants may be from
>      impurities in the fuel or from the
>      environment (particularly at coastal
>      areas).

ECF No. 216, PageID # 2726.

III.     **SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198
F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their
position that a material fact is or is not genuinely disputed by

either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp.,

477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., Inc., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). See Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party. T.W. Elec. Serv.,

<u>Inc.</u>, 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. <u>Id.</u> When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>Id.</u>

**IV.      ANALYSIS.**

Chromalloy argues that the economic loss doctrine bars all three tort claims asserted in the Complaint. The court concludes that two of the claims are barred.

**A.      The Negligence and Strict Liability Claims are Barred by the Economic Loss Doctrine.**

The economic loss doctrine precludes a plaintiff from recovering in tort for purely economic losses stemming from injury only to the product itself. <u>Ass'n of Apartment Owners of Newtown Meadows v. Venture 15, Inc.</u>, 115 Haw. 232, 285, 167 P.3d 225, 278 (2007); <u>City Express, Inc. v. Express Partners</u>, 87 Haw. 466, 469, 959 P.2d 836, 839 (1998). The United States Supreme Court explains, "Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" <u>East River S.S. Corp v. Transamerica Delaval, Inc.</u>, 476

U.S. 858, 872 (1986) (citation omitted) (quoted in State v. U.S. Steel Corp., 82 Haw. 32, 40, 919 P.2d 294, 302 (Haw. 1996)). Broadly speaking, the economic loss doctrine is designed to maintain a distinction between damage remedies for breach of contract and for tort.

The parties in this case dispute whether the blade that broke off from the high pressure turbine and damaged the entire engine can be said to have damaged itself or other property. If the Chromalloy blade damaged what could be viewed as "other property," then the economic loss doctrine, which looks to damage to a product itself, is inapplicable.

This court begins its analysis with the United States Supreme Court's analysis in East River. That case involved the construction of four supertankers to transport oil. The shipbuilder contracted with another company "to design, manufacture, and supervise the installation of turbines . . . that would be the main propulsion units." Id. at 859. Multiple problems with the turbines arose. On one of the ships, a first-stage steam reversing ring disintegrated, causing damage to other parts of the turbine. Id. at 860. A lawsuit was filed by the shipbuilder's subsidiaries, which had chartered the tankers, against the turbine manufacturer. The Supreme Court ruled that the economic loss doctrine barred a claim for strict liability

arising from damage to the turbine caused when a turbine part
(the ring) was damaged.  Id. at 875.

The Court reasoned that the damage to the turbine did
not involve damage to "other property."  Instead, because the
turbine manufacturer had provided an "integrated package," the
turbine as a whole was "regarded as a single unit."  Id. at 867.
The Court noted, "'Since all but the very simplest of machines
have component parts, [a contrary] holding would require a
finding of 'property damage' in virtually every case where a
product damages itself.  Such a holding would eliminate the
distinction between warranty and strict products liability.'"
(quoting N. Power & Eng'g Corp. v. Caterpillar Tractor Co., 623
P.2d 324, 330 (Alaska 1981)).  The Court ruled that a claim based
on damage to the product itself was a warranty claim because the
injury was the failure of the product to function properly.  Id.
at 868.

The present case involves facts very much like those
before the United States Supreme Court in East River.  The
Chromalloy blade broke off and caused damage to the high pressure
turbine housing the blade, just as the first-stage steam
reversing ring disintegrated and caused damage to the turbine in
East River.  Consistent with East River, the economic loss
doctrine bars MECO's claims of negligence and strict liability
for damage to the high pressure turbine caused by the broken

13

Chromalloy blade.  This court views the high pressure turbine with the Chromalloy blade as part of an "integrated package." Any damage the blade caused was damage to the product itself, for which recovery is unavailable.  See id. at 867.

In reaching this conclusion, this court has as its touchstone the inherently contractual origin of the negligence and strict liability claims that MECO asserts in Counts I and II of the First Amended Complaint.  The negligence claim asserted in Count I is based on Chromalloy's alleged breach of a duty to exercise reasonable care and caution in the design, manufacture, and/or distribution of the high pressure turbine with Chromalloy blades and vanes.  Count II, the strict liability claim, alleges that Chromalloy's high pressure turbine was unreasonably dangerous because it was defectively designed, manufactured, and/or distributed.  See ECF No. 130.  Both of these claims are grounded in the notion that Chromalloy's product did not perform properly.  Both claims bring to mind the kind of claim that was barred in East River, a case that involved a company that agreed to design, manufacture, and supervise the installation of turbines.  As the Supreme Court noted in East River, this kind of claim, even if denominated as a tort claim, is in the nature of a warranty claim.  Tort damages are not available for such contract-flavored claims.  See Keahole Point Fish LLC v. Skretting Canada Inc., 971 F. Supp. 2d 1017, 1021 (2013);

<u>Burlington Insurance Company v. United Coatings Manufacturing</u>

<u>Company</u>, 518 F. Supp. 2d 1241, 1252 (D. Haw. 2007).

This court understands, of course, that simply saying
that damages are not recoverable when a product damages itself
does not, without more, define what "the product itself" is.
When the Chromalloy blade broke off, it damaged not only the high
pressure turbine that it was a part of, but also other parts of
the LM2500 gas turbine engine, including the low pressure
turbine. <u>See</u> Mauri Decl. ¶ 21. As this court explains below,
this court views the entire LM2500 gas turbine engine as the
"product" for purposes of the economic loss doctrine.

The process of defining the "product" for purposes of
the economic loss doctrine was the court's focus when Judge
Harold Fong of this district court decided <u>Exxon Shipping Company</u>
<u>v. Pacific Resources, Inc.</u>, 835 F. Supp. 1195 (D. Haw. 1993).
Judge Fong examined a dispute between the owner of an offshore
mooring terminal and the firm that had designed and built the
terminal. A ship owner had sued after its ship, which had been
chained to the terminal, broke away from the terminal and
grounded on a reef. <u>Id.</u> at 1197. The breakaway may have
occurred when the chain linking the ship to the terminal broke.
<u>See</u> <u>id.</u> at 1201. Numerous parties were involved in the ensuing
claims, but in the ruling in issue here, the court, relying on
the Supreme Court's decision in <u>East River</u>, noted that "it is

necessary to define exactly what is meant by the 'product' so that the damage caused to the product can be excluded under the economic loss doctrine." Id. at 1199.

Judge Fong reviewed case law from other districts and focused on the "object of the bargain" between the mooring terminal owner and the mooring terminal builder, noting that it did not matter whether the chain was the original chain or a replacement one, as an "integrated product may have any number of spare parts in the ordinary course of events." Id. at 1200-01. Because the "object of the bargain" was a completed mooring terminal, the court viewed the entire terminal, including the chain, as the "product" for purposes of the economic loss doctrine. Id. at 1202. Accordingly, the court precluded the terminal owner from recovering tort damages from the terminal builder under the economic loss doctrine. Id.

Judge Fong's focus on the "object of the bargain" is consistent with what this court has identified as its touchstone: the contractual grounding of the parties' relationship. This court has evidence in the record of what the object of the parties' bargain was in this case. Chromalloy's blade came with a warranty, ECF No. 214-2, that covered "downstream damages" to "the subject engine or any of the following parts of the subject engine: fuel control, external wiring, tubing, or gear box accessories" caused by a defective Chromalloy part "up to one

16

million dollars ($1,000,000) per occurrence and up to ten million dollars ($10,000,000) in the aggregate" for a period of eighteen months or 12,000 operating hours, whichever occurred earlier. See id. The words "the subject engine" are not defined in the warranty, but Chromalloy warranted the quality of "every Chromalloy manufactured new Industrial Aero Derivative Gas Turbine ('IADGT') engine component or assembly ('Components') supplied by it to Jet Turbine Services, Inc. (hereafter 'JTS')" under proper and normal use "in a JTS customer engine." Id. The reference in the warranty to damage to a customer's engine indicates that Chromalloy and the purchaser of a Chromalloy part intended to treat the part as tied to the entire engine.

The expiration of Chromalloy's warranty before the accident in issue is irrelevant to this court's analysis. Nor is the court concerned about whether MECO knew about the warranty's existence or its terms. What matters is that the damage caused to the entire engine by a defective Chromalloy part was the subject of bargaining and governed by contract; the integrity of the engine as a whole was the object of the parties' bargain. See East River, 476 U.S. at 872 ("Damage to a product itself is most naturally understood as a warranty claim."). Certainly, the parties could have bargained for a better or longer warranty, but their failure to do so does not give rise to a tort remedy for a matter governed by contract law.

In treating the entire engine and the Chromalloy blade as the same "product" this court is making no greater leap than the Hawaii Supreme Court made in <u>Association of Apartment Owners of Newtown Meadows v. Venture 15, Inc.</u>, 115 Haw. 232, 285, 167 P.3d 225, 278 (2007), in which the court declined to treat skewed door jambs or termite damage as "other property" distinct from defective concrete slabs.  The Hawaii Supreme Court explained that "purely economic" damages that are "consequential damages" flowing from damage to one part of property do not constitute "other property" for which tort recovery is available if the damage claims have contractual bases.

<u>Newtown Meadows</u> built on the Hawaii Supreme Court's decision in <u>State v. U.S. Steel Corp.</u>, 82 Haw. 32, 40, 919 P.2d 294, 302 (1996), in which the court held that the economic loss doctrine barred the state's product liability and negligent design and/or manufacture claims, but not its negligent misrepresentation claim.  In <u>Newtown Meadows</u>, an association of apartment owners ("AOAO") sued, among other defendants, a masonry subcontractor that had allegedly installed defective concrete slabs in residential townhouse condominium units.  The AOAO argued that its tort claims were not barred by the economic loss doctrine because the defective concrete slabs had allegedly caused other damage in the form of cracked floor tiles, damaged walls, skewed door jambs and windows, and damage caused by

18

termites that had entered through cracks in the floors.  The

Hawaii Supreme Court rejected this argument, noting that "such

consequential damages do not constitute damage to 'other

property.'"  Damages consisting of "purely economic losses" were

"not recoverable in negligence."  Id. at 287-88, 167 P.3d at

280-81.  The damages caused when Chromalloy's blade broke were no

less consequential, no less purely economic, and no less barred.

What was critical to the Hawaii Supreme Court's

analysis in Newtown Meadows was the nexus between the negligence

claims and underlying contractual provisions.  See id. at 288,

167 P.3d at 281 ("we conclude that the AOAO's negligence claim

based on violations of contract specifications are barred by the

economic loss rule" (emphasis in original)).  The court said:

> The crux of [the economic loss doctrine] is
> the premise that economic interests are
> protected, if at all, by contract principles,
> rather than tort principles.  Contract law is
> designed to enforce the expectancy interests
> created by agreement between the parties and
> seeks to enforce standards of quality.  This
> standard of quality must be defined by
> reference to that which the parties have
> agreed upon.  In contrast, tort law is
> designed to secure the protection of all
> citizens from the danger of physical harm to
> their persons or to their property and seeks
> to enforce standards of conduct.  These
> standards are imposed by society, without
> regard to any agreement.  Tort law has not
> traditionally strictly protected economic
> interests related to product quality--in
> other words, courts have generally refused to
> create a duty in tort to prevent such
> economic losses.

Id. at 291, 167 P.3d at 284 (quoting Calloway v. City of Reno, 993 P.2d 1259 (Nev. 2000), overruled on other grounds by Olson v. Richard, 89 P.3d 31 (Nev. 2004)).

While there was clearly no privity of contract between the AOAO and the masonry subcontractor, privity was a concern only if allowing claims between parties lacking privity of contract "would blur the distinction between contract and tort law." See id. at 285, 167 at 278. Absent any such blurring, the Hawaii Supreme Court expressed no concern about the absence of privity. See also Leis Family Ltd. P'ship v. Silversword Eng'g, 126 Haw. 532, 273 P.3d 1218 (Ct. App. 2012) (economic loss doctrine bars recovery whenever allowing recovery would blur distinction between contract and tort law, without regard to whether parties are in privity of contract).

Not content to rely on East River, Exxon, and Newtown Meadows as requiring application of the economic loss doctrine, Jet Turbine argued vigorously at the hearing on the present motions that this court should look to a decision issued just last year by Judge Derrick Watson of this district. Launiupoko Water Co. v. J-M Manufacturing Company, 2014 WL 6685965 (D. Haw. Nov. 25, 2014), involved claims by private companies that supplied water services to various areas on Maui. The companies sued pipe manufacturers, alleging that piping products had leaked and/or burst. See Complaint ¶¶ 3-5, Civ. No. 14-303, ECF No. 1

(July 1, 2014).  The water companies alleged that, with the leaks
or bursts, "not only is the pipe itself damaged, but as a result
of the water being released, the surrounding property, including
but not limited to, streets, sidewalks, landscaping and driveways
is damaged."  Id. ¶ 23.  The pipe companies moved to dismiss,
citing the economic loss doctrine.  The water companies contended
that the doctrine was inapplicable because they were not simply
seeking damages for harm to their water distribution system, but
were also seeking recovery for damage to "other property," namely
"surrounding property including, but not limited to, streets,
sidewalks, landscaping and driveways."  Launiupoko Water Co.,
2014 WL 6685965, at *1.

        Judge Watson ruled that the water companies' "other
property" contention was insufficient to establish an injury for
standing purposes, as it was not clear that the water companies
owned the "other property."  Id. at *4.  Despite this possible
jurisdictional issue, Judge Watson turned to the merits,
concluding that the economic loss doctrine barred recovery for
damage to the purported "other property" because that harm was
foreseeable and constituted consequential damage resulting from
the leaks and bursts.  Id.

        Pipes traversing large swaths of land raise interesting
issues about how best to define the property that is itself the
subject of the economic loss doctrine and about the breadth of

what falls within and outside of "other property."  Because the
Chromalloy blade and the MECO engine enjoyed a much more confined
relationship, this court is not pressed here to address anything
like the "other property" circumstances Judge Watson considered.
It is enough for this court that the Chromalloy blade is as
integrated into the MECO engine as the ring was integrated into
the turbine in East River, and as contractually tied to the MECO
engine as the skewed door jambs were to the concrete slab in
Newtown Meadows.

        For its part, MECO, seeking the opposite of the result
urged by Jet Turbine (that is, seeking to avoid the application
of the economic loss doctrine), also urged this court at the
hearing on the present motions to look to a decision by another
judge in this district.  MECO identified as the strongest case in
its favor Judge Alan C. Kay's decision in Windward Aviation, Inc.
v. Rolls-Royce Corporation, 2011 WL 2670180 (D. Haw. July 6,
2011).  Judge Kay denied a motion for summary judgment seeking
application of the economic loss doctrine to bar tort claims for
damage to a helicopter.  The helicopter had crashed when its
engine failed, allegedly because of a defective enhanced Fourth
Stage Wheel.  The owner of the helicopter sued Roll-Royce Engine
Services, the company that had manufactured and installed the
enhanced Fourth Stage Wheel.  Judge Kay determined that Rolls-
Royce, which submitted no evidence of the object of the parties'

bargain, failed to meet its burden of demonstrating as a matter of law that the economic loss doctrine barred the helicopter owner's claims of negligence and strict products liability.  Id. at *8.

The helicopter owner had purchased the helicopter's engine three years before it had bought the enhanced Fourth Stage Wheel and had bought the helicopter's hull three years after it had bought the enhanced Fourth Stage Wheel.  Id. *9.  The helicopter "was composed of parts that [the owner] purchased over a period of seven years from at least four different entities, only one of which appears to have been Rolls-Royce."  Id.  It appears to this court that Judge Kay may not have had enough information to reach any conclusion as to whether any of the damages claimed involved "other property."  Parts were clearly purchased over time, so that the record may not have indicated whether the resulting helicopter was an "integrated unit" in the parties' contemplation.

Judge Kay simply denied a motion for summary judgment that sought to apply the economic loss doctrine to bar tort-based claims.  2011 WL 2670180, at *8.  Judge Kay did not rule that the economic loss doctrine was inapplicable.  That is, fairly read, Judge Kay's refusal to say that tort damages were unavailable cannot be equated with a decision saying that tort damages were available.  His ruling left factual questions for trial.  Whether

the parties ever considered the helicopter to be a completed or
integrated product, or whether it was an evolving item under
continuing construction, is not clear from the decision.

MECO says that one thing Windward Aviation has in
common with the present case is that the part at issue in
Windward Aviation was purchased on the recommendation that it
would improve helicopter performance.  Id.  The Chromalloy blade
that broke was purchased because it was supposed to last longer
than the original GE part.  Lasting longer, however, is not
necessarily the same as performing better.  MECO hoped to avoid
the expense of more frequent and costly replacements, but it is
not at all clear that MECO thought the engine would work better
with the Chromalloy blade.

MECO also points to Judge Kay's ruling that the
enhanced Fourth Stage Wheel was not simply a replacement part
that the parties had contemplated or expected would be necessary.
This court does not think that the facts before Judge Kay can be
analogized to the facts in the present case such that it can be
said that the Chromalloy blade could not have been a replacement
part.  Being an improvement in some capacity neither creates nor
destroys an item's replacement character.  An item is a
replacement part as a matter of its function, not as a matter of
its quality.  The Chromalloy blade was made to fit the GE engine
and did not become a new, unanticipated, or unnecessary item

separable from the pre-existing engine just because it was supposed to last longer than the original GE part.

For purposes of deciding whether the economic loss doctrine applies, it does not matter whether the damage in issue results from a malfunction in a replacement part or in an original part. Thus, the Third Circuit in <u>Sea-Land Service, Inc. v. General Electric Company</u>, 134 F.3d 149, 154 (3d Cir. 1998), was unconvinced "that there is any rational reason to deviate from the integrated product rule simply because the defective component happens to be a replacement part instead of the part originally supplied with the product. The law is clear that if a commercial party purchases all of the components at one time, regardless of who assembles them, they are integrated into one product."

In that case, a vessel owner had replaced parts in the ship's engine, including connecting rods. <u>Id.</u> at 151. There was no dispute that one of the rods had "failed" and caused damage to the engine and to the engine casing. <u>Id.</u> Viewing the entire engine as an "integrated product," the Third Circuit barred tort damages for the injury to the engine caused by the failure of the replacement rod. <u>Id.</u> at 154. The court noted that because "all commercial parties are aware that replacement parts will be necessary, the integrated product should encompass those replacement parts when they are installed in the engine." <u>Id.</u>

The court further noted that, "in purchasing and installing replacement parts, the parties can, as with the original purchase, negotiate the terms of the sale and of any warranties." See also Exxon Shipping, 835 F. Supp. at 1201.

There is no dispute that Chromalloy's fans and blades were marketed as replacements for the original parts. Chromalloy marketed its fans and blades as products that would last longer than the original parts. Replacement parts in general, even those made by the very manufacturer who made the original parts, may be marketed as improved items. Installing an "upgraded" part in a turbine does not destroy the "integrated" nature of a product. See Sea-Land, 134 F.3d at 154 ("integrated product should encompass those replacement parts when they are installed in the engine"). To hold otherwise would mean that almost no product needing a new battery, light bulb, or clasp could retain its identity for very long as an integrated product.

The relationship between a replacement part like the Chromalloy blade and MECO's engine is easily distinguished from the relationship between a ship and the "other property" in Saratoga Fishing Company v. J.M. Martinac & Company, 520 U.S. 875 (1997). In that case, the Supreme Court held that miscellaneous equipment added to a fishing vessel after it was purchased was "other property" not covered by the economic loss doctrine's bar concerning tort-based claims for injury to the added equipment.

Saratoga Fishing arose out of an engine room fire and flood that sank a fishing vessel. Id. at 878. The Supreme Court assumed that a hydraulic system had been defectively designed, and that the design was a significant cause of the accident. Id. The hydraulic system had been part of the ship when it was first sold. The purchaser had added a skiff, a seine net, and various spare parts to the vessel, then sold the ship to Saratoga Fishing. When the ship sank, Saratoga Fishing brought suit against the ship builder and the hydraulic engine designer. Id. The Supreme Court held that the additional equipment added after the vessel was initially purchased was not part of the product itself, which it defined as "the original ship with the defective hydraulic system." The additional equipment was "other property," and the economic loss doctrine did not bar recovery for the loss of this "extra" property. Id. at 885-86.

This case does not involve anything comparable to the "other property" in Saratoga Fishing. There is no analogous "extra" or "add-on." The LM2500 engine was an integrated product requiring blades in its high pressure turbine.

Hawaii has its own version of Saratoga Fishing. In Kawamata Farms, Inc. v. United Agri Products, 86 Haw. 214, 948 P.2d 1055 (1997), the Hawaii Supreme Court refused to apply the economic loss doctrine to a claim by farmers that a pesticide, Benlate, had damaged their crops. The court reasoned that the

27

farmers were not claiming that the pesticide itself had been damaged. Rather, the farmers were claiming that the pesticide had damaged their crops, which the court determined was "other property." Id. at 254, 948 P.2d at 1095. The court explained that the farmers had

> bargained for Benlate as the finished
> product, and this finished product damaged
> "other property" consisting of the
> Plaintiffs' crops upon which Benlate was
> applied. Where the finished product caused
> damage to other property, the economic loss
> doctrine does not apply, and, thus, the
> economic loss doctrine did not bar the
> Plaintiffs from recovering damages for their
> crop damage.

Id. See also Keahole, 971 F. Supp. 2d at 1030.

The damage caused by the broken Chromalloy blade to other parts of MECO's spare LM2500 gas turbine engine is not analogous to the crop damage in Kawamata Farms. The blade was a component of the whole engine that was the equivalent of "the finished product" the Hawaii Supreme Court said the pesticide in Kawamata Farms was.

This court's review of the law of economic loss causes this court to conclude that MECO's negligence and strict liability claims fail. Summary judgment is granted in favor of Chromalloy with respect to Counts I and II of the First Amended Complaint. For the same reason, Third-Party Defendants are granted summary judgment with respect to Chromalloy's claims for

contribution and indemnity relating to Counts I and II of the
First Amended Complaint.

> **B.    The Economic Loss Doctrine Does Not Bar the
> Negligent Misrepresentation Claim Asserted in
> Count III of the First Amended Complaint.**

Although this court agrees with Chromalloy that the
economic loss doctrine bars the negligence and strict liability
claims asserted by MECO in Counts I and II of the First Amended
Complaint, the court disagrees with Chromalloy's argument that
the doctrine also bars the negligent misrepresentation claim MECO
asserts in Count III.

In U.S. Steel, 82 Haw. at 40-41, 919 P.2d at 302-03,
the Hawaii Supreme Court determined that the economic loss
doctrine barred product liability claims and negligent
design/negligent manufacture claims, but not negligent
misrepresentation claims.  The court defined the duty protected
by the economic loss doctrine as separate from the duty to
exercise reasonable care with respect to communicating
information.  The negligent misrepresentation claim brought by
the State of Hawaii, which had no direct contract with U.S.
Steel, concerned U.S. Steel's alleged failure to exercise
reasonable care or competence in obtaining or communicating
information that guided Hawaii in deciding to use steel in
building Aloha Stadium.  Specifically, Hawaii took issue with
U.S. Steel's representation that the company's "weathering steel"

product was appropriate for the stadium's location and for the weather conditions. Id. at 42, 919 P.2d at 304. The Hawaii Supreme Court concluded that the economic loss doctrine was inapplicable to such a negligent misrepresentation claim, reasoning that the duty underlying that claim was the duty to exercise reasonable care or competence in obtaining or communicating information for the guidance of others in business transactions. Id. at 40-41, 919 P.2d at 302-03. This duty was distinct from a manufacturer's duty to prevent a product from injuring itself. It was that latter duty, grounded in contract, that was eliminated by the economic loss rule. Id.

Subsequent cases have clarified when negligent misrepresentation claims are barred by the economic loss doctrine. No case has overruled U.S. Steel. Instead, Hawaii's courts have distinguished between negligent misrepresentation claims that are, at their core, contractual in origin, and negligent misrepresentation claims that are not based on contractual obligations. As this court reads those cases, the contractually based negligent misrepresentation claims are barred, but the latter survive under U.S. Steel.

The distinction this court articulates is evident in a decision the Hawaii Supreme Court issued a year after it decided U.S. Steel. In City Express, Inc. v. Express Partners, 87 Haw. 466, 959 P.2d 836 (1998), the court considered a negligence

30

action against architects hired to design a warehouse.  The
parties disputed whether the second floor of the warehouse had
been intended to be used only for light storage, or whether
forklifts had been intended to be used there.  In fact, forklifts
were used on the second floor, which began to crack.  Id. at 467,
959 P.2d at 837.  Examining the negligence claims, the Hawaii
Supreme Court acknowledged that, in U.S. Steel, "we held that the
economic loss rule did not bar recovery by the State of Hawai`i
against a steel manufacturer who had made direct representations
that its product was appropriate for the construction of a sports
stadium.  We held that the State could recover under Restatement
(Second) of Torts § 552 (1977) for the tort of negligent
misrepresentation."  Id. at 469, 959 P.2d at 839.

However, noting that the parties in City Express,
unlike the State of Hawaii and U.S. Steel, had a contractual
relationship, the court said, "In this case, involving a design
professional who acts under contract with the owner, we hold that
recovery is properly limited to contract remedies and that a tort
action under section 552 [relating to information negligently
supplied for the guidance of others] is not available."  Id. at
470, 959 P.2d at 840.

While City Express did not overrule U.S. Steel, it
rendered the U.S. Steel holding that negligent misrepresentation
claims survived the economic loss doctrine inapplicable to

negligent misrepresentation claims with contractual bases.
Further clarification by the Hawaii Supreme Court as to when
negligent misrepresentation claims are and are not barred by the
economic loss doctrine followed some years later in the Hawaii
Supreme Court's Newtown Meadows decision. That case, discussed
earlier in this order, involved numerous negligence claims,
including negligent misrepresentation claims, asserted in the
context of construction litigation. Tracing its own
jurisprudence, including U.S. Steel and City Express, the Hawaii
Supreme Court parsed the AOAO's claims arising out of defective
concrete slabs installed by a masonry subcontractor, concluding
that negligence claims based on violations of contract
specifications were barred by the economic loss rule, but that
other negligence claims, such as claims based on violations of
the Uniform Building Code, were not barred. 115 Haw. at 295, 167
P.3d at 288. This court reads Newtown Meadows as making it clear
that, under Hawaii law, negligent misrepresentation claims are
barred by the economic loss doctrine only when the claims have a
contractual basis.

   In its opposition to Chromalloy's motion, MECO narrows
its negligent misrepresentation claim:

> MECO does not contend that Chromalloy is
> liable for negligent misrepresentation
> because its turbine blades did not perform as
> warranted or for some minimum amount of time
> or operating hours. MECO's claim is founded
> on Chromalloy's failure to provide adequate

32

> technical guidance to MECO in 2007, when
> Chromalloy first became aware that its
> turbine blades had undergone Type II hot
> corrosion cracking in Engine No. 481-669.

ECF No. 267-1, PageID # 4517.  The court therefore deems MECO to have abandoned any portion of its negligent misrepresentation claim not grounded in the technical guidance allegedly provided by Chromalloy in 2007.  With respect to what remains of Count III, U.S. Steel teaches that the economic loss doctrine is inapplicable.

The basis of MECO's remaining negligent misrepresentation claim against Chromalloy is Chromalloy's alleged failure to use reasonable care in obtaining and communicating technical guidance to MECO in 2007.  MECO says it detrimentally relied on Chromalloy's alleged statement.

As explained in U.S. Steel, this duty of reasonable care is distinct from the duty eliminated by the economic loss rule.  82 Haw. at 41, 919 P.2d at 303.  What the economic loss doctrine eliminated was a manufacturer's duty to prevent a product from injuring itself.  Chromalloy continued to have a duty to use reasonable care to obtain and communicate information for MECO's guidance.  Allowing MECO to sue over an alleged breach of this remaining duty does not "blur" the lines between contract and tort liability, as the claim is not based on the failure of a product to act as advertised.  It is instead based on representations that no one even alleges were contractually

33

required.  See Newtown Meadows, 115 Haw. at 292, 167 P.3d at 285;
Leis Family Limited Partnership, 126 Haw. at 538, 273 P.3d at
1224.

This court acknowledges that not all of the judges in
this district have adopted the above reading of the Hawaii case
law on the interplay between the economic loss doctrine and
negligent misrepresentation claims.

In Burlington Insurance Co. v. United Coatings
Manufacturing Co., Inc., 518 F. Supp. 2d 1241 (D. Haw. 2007),
Judge J. Michael Seabright recognized in a footnote that, under
Newtown Meadows, the economic loss rule might bar contract-based
negligent misrepresentation claims.  Id. at 1254 n. 10. Because
he disposed of the issue on other grounds, he declined to
actually rule on that issue and did not, in any event, have any
reason to address whether negligent misrepresentation claims with
noncontractual origins could proceed.

In Keahole Point Fish LLC v. Skretting Canada, Inc.,
971 F. Supp. 2d 1017 (D. Haw. 2013), Judge Kevin Chang applied
the economic loss doctrine to bar negligent misrepresentation
claims.  Citing City Express as support, id. at 1028, Judge Chang
concluded that "the Hawaii courts have held that rule applies to
. . . negligent misrepresentation claims."  Id. at 1031.
Although Judge Chang did not distinguish between contract-related
negligent misrepresentation claims and other negligent

34

misrepresentation claims and may have been ruling that all negligent misrepresentation claims are barred by the economic loss doctrine, this court notes that the misrepresentation claims in issue in Keahole Point at least arguably had contractual bases. See id. at 1031-34 (analyzing four allegedly intentional misrepresentations, one of them construed as a prediction rather than a misstatement of past or existing fact, without indicating that the allegedly negligent misrepresentations involved different statements).

Importantly, Judge Chang declined to extend the economic loss doctrine to bar intentional misrepresentation claims. He cited as his reason the absence of state court precedent on that subject. This court sees a refusal to apply the economic loss doctrine to intentional misrepresentation claims as consistent with the concept of restricting the application of the economic loss doctrine to contractually based negligent misrepresentation claims. Intentional misrepresentation claims are essentially fraud claims, not contract claims. See Barber v. Ohana Military Cmtys., LLC, 2014 WL 3529766 (D. Haw. July 15, 2014)(noting that the elements of fraud and intentional misrepresentation are the same under Hawaii law). When one party is acting fraudulently, the other cannot protect itself by negotiating the contract terms or obtaining a longer or better warranty. Thus, allowing a tort remedy would

not blur the distinction between contract remedies and tort remedies.

The decision within this district that is most clearly at odds with the negligent misrepresentation analysis articulated in the present order is Judge Watson's decision in Launiupoko. The negligent misrepresentation claim in that case arose out of alleged representations that pipe products that ending up leaking and bursting satisfied AWWA, ASTM, ANSI/MSF, and UL standards, which are established by private organizations. See Complaint ¶¶ 65-67, Civ. No. 14-303, ECF No. 1 (July 1, 2014). The plaintiffs complained that the defendants had "failed to exercise reasonable care or competence in the communication of information to prospective purchasers and users of the pipe." Id. While Judge Watson dismissed the negligent misrepresentation claim as barred by the economic loss doctrine, the claim appears to this court to be allowed under U.S. Steel and Newtown Meadows.

First, the plaintiffs in Launiupoko are alleging a failure to use reasonable care in communicating information. The duty to exercise reasonable care or competence in obtaining or communicating information for the guidance of others in business transactions was the very duty that the Hawaii Supreme Court said in U.S. Steel was not eliminated by the economic loss rule. See 82 Haw. at 40-41, 919 P.2d at 302-03 (distinguishing duty to communicate guidance or information from duty to prevent a

36

product from injuring itself and noting that economic loss rule eliminated latter, but not former, duty).

Second, a misrepresentation about whether piping products satisfy private industry standards, absent allegations that those industry standards have been incorporated into contract provisions, does not appear to be a contract-based misrepresentation. The negligent misrepresentation claim in Launiupoko instead appears akin to the negligence claim based on alleged Uniform Building Code violations in Newtown Meadows that the Hawaii Supreme Court said was not barred by the economic loss doctrine. This was in contrast to the negligence claim based on a violation of contract specifications, which was indeed barred. Newtown Meadows, 115 Haw. at 295, 167 P.3d at 288.

This court may admittedly be missing something about the circumstances in Launiupoko, having limited its review of that case to reading only Judge Watson's dismissal ruling and the complaint that is the subject of that ruling. Alternatively, this judge and Judge Watson may simply differ as to the impact of the City Express analysis on the portion of the U.S. Steel decision that permitted the state's negligent misrepresentation claim to proceed. In hewing to its determination that the economic loss rule does not bar MECO's negligent misrepresentation claim, this court can only note that Newtown Meadows, which clearly treated both U.S. Steel and City Express

37

as good law, focused on whether alleged negligence was based in contract. Because MECO asserts a negligent misrepresentation claim with no contractual basis, this court, relying on <u>U.S. Steel</u>, as clarified by its progeny, allows that claim to proceed.

Chromalloy's motion for summary judgment with respect to the negligent misrepresentation claim in Count III, as narrowed by MECO's opposition, ECF No. 267-1, is denied, and Chromalloy's Third-Party claim for contribution and indemnification with respect to that claim also remains for adjudication.

### C. The Motions Seeking Leave to File Exhibits Under Seal Are Mostly Denied.

On December 5, 2014, Chromalloy sought to file Exhibits A to H under seal, claiming they involved "confidential" and "highly confidential" matters. <u>See</u> ECF No. 220. MECO filed a similar motion on January 30, 2015. <u>See</u> ECF No. 276. The court denies these motions as moot, as the court need not consider any of those exhibits in connection with the present motion. Pursuant to Local Rule 83.12, Chromalloy and MECO may withdraw the exhibits they sought permission to seal, so that those exhibits will not go into the public file.

The court grants MECO's motion to file its opposition in the public file with the proposed limited redactions so long as it files an unredacted version in the court's sealed files. It is the court's understanding that the unredacted version was

timely served on other parties.  The limited redactions do not affect this court's analysis.

### D.    Chromalloy's Motion to Exclude the Opinions of Herbert Sirois Is Denied As Moot.

On December 8, 2014, Chromalloy filed a motion seeking to exclude the opinions of MECO's expert, Herbert Sirois.  See ECF No. 222.  Although the motion seeks to completely exclude Sirois's opinions, it is focused on his opinions concerning the negligence and strict liability claims.  See id.  Because summary judgment is granted as a matter of law in favor of Chromalloy on those claims, there is no need for expert testimony concerning those claims.  Accordingly, to the extent Chromalloy seeks to exclude Sirois's opinions concerning those claims, its motion is denied as moot.

The only claim that survives the present order is MECO's assertion that Chromalloy made negligent misrepresentations going to technical guidance in 2007 (and the Third-Party claim for contribution and indemnification arising out of that negligent misrepresentation claim).  In the reply in support of its motion to exclude Sirois's testimony, Chromalloy notes that it "has moved separately to strike Sirois' new opinions, Dkt. # 295," concerning the negligent misrepresentation claims.  See ECF No. 302, PageID # 6530.  A hearing on that motion to strike has been set before Magistrate Judge Barry M. Kurren on March 31, 2015.  See ECF No. 323.  It appears,

therefore, that the Chromalloy motion filed on December 8, 2014, the only motion relating to Sirois covered by the present order, does not apply to Sirois's opinions with respect to the remaining negligent misrepresentation claim.

**V.        CONCLUSION.**

The court grants in part and denies in part Chromalloy's motion for summary judgment, ECF No. 201.  To the extent the motion seeks summary judgment with respect to MECO's negligence and strict liability claims (Counts I and II of the First Amended Complaint) against Chromalloy, the motion is granted on the ground that those claims are barred by the economic loss doctrine.  However, summary judgment is denied with respect to the negligent misrepresentation claim (Count III of the First Amended Complaint).  Given this ruling, the court need not examine Chromalloy's argument that MECO's negligence and strict liability claims fail because of a lack of evidence that the product was defective or that it caused MECO's injury.

The court also grants Third-Party Defendants' motion for summary judgment on the Third-Party claims for indemnification and contribution asserted against them by Chromalloy to the extent Chromalloy's claims arise out of MECO's negligence and strict liability claims, which are disposed of by this order.  <u>See</u> ECF No. 197.  However, the Third-Party Complaint remains in effect with respect to indemnification and

contribution claims arising out of any liability on Chromalloy's part for negligent misrepresentation as asserted in Count III of the First Amended Complaint.

This ruling makes it unnecessary for the court to address Chromalloy's motion to seal various documents, ECF No. 220. The court therefore denies that motion as moot. Chromalloy may withdraw the documents that it seeks to file under seal. <u>See</u> Local Rule 83.12.

The ruling similarly makes it unnecessary for the court to address MECO's motion to seal various documents, ECF No. 276. That motion is denied as moot, and MECO may similarly withdraw the exhibits it sought to seal. However, the court grants MECO's motion to file its opposition in the public file with the proposed limited redactions, so long as it files an unredacted version in the court's sealed files. <u>See</u> ECF No. 267-1. The limited redactions do not affect this court's analysis.

Chromalloy has filed a motion to exclude the expert report of Herbert Sirois, claiming that MECO wants to offer his opinions in support of its negligence and strict liability claims. <u>See</u> ECF No. 222. That motion is denied as moot, given the court's ruling in this order. This ruling does not affect the motion pending before Magistrate Judge Kurren concerning Sirois's opinion relating to the remaining negligent misrepresentation claim.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 27, 2015.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
Chief United States District Judge

Maui Elec. Co. v. Chromalloy Gas Turbine, LLC; Civil No. 12-00486 SOM/BMK; ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF CHROMALLOY GAS TURBINE, LLC, WITH RESPECT TO COUNTS I AND II OF THE FIRST AMENDED COMPLAINT BUT DENYING SUMMARY JUDGMENT WITH RESPECT TO COUNT III OF THE FIRST AMENDED COMPLAINT; ORDER GRANTING THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO THE EXTENT THE THIRD-PARTY COMPLAINT SEEKS CONTRIBUTION AND INDEMNIFICATION IN CONNECTION WITH COUNTS I AND II OF THE FIRST AMENDED COMPLAINT; ORDER DENYING MOTIONS TO SEAL DOCUMENTS AND MOTION TO EXCLUDE OPINIONS OF HERBERT SIROIS, BUT GRANTING REQUEST TO REDACT LIMITED INFORMATION FROM OPPOSITION BY MAUI ELECTRIC COMPANY, LIMITED